KATZENBACH, ATTORNEY GENERAL, ET AL. *v.*
MORGAN ET UX.

No. 847.   Argued April 18, 1966.—Decided June 13, 1966.*

---

*Together with No. 877, *New York City Board of Elections* v.
*Morgan et ux.,* also on appeal from the same court.

642

*Solicitor General Marshall* argued the cause for appellants in No. 847. With him on the brief were *Assistant Attorney General Doar, Ralph S. Spritzer, Louis F. Claiborne, St. John Barrett* and *Louis M. Kauder.*

*J. Lee Rankin* argued the cause for appellant in No. 877. With him on the brief were *Norman Redlich* and *Seymour B. Quel.*

*Alfred Avins* argued the cause and filed a brief for appellees in both cases.

*Rafael Hernandez Colon,* Attorney General, argued the cause and filed a brief for the Commonwealth of Puerto Rico, as *amicus curiae,* urging reversal.

*Jean M. Coon,* Assistant Attorney General, argued the cause for the State of New York, as *amicus curiae,* urging affirmance. With her on the brief were *Louis J. Lefko-*

*witz*, Attorney General, and *Ruth Kessler Toch*, Acting Solicitor General.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

These cases concern the constitutionality of § 4 (e)·of the Voting Rights Act of 1965.[1] That law, in the respects pertinent in these cases, provides that no person who has successfully completed the sixth primary grade in a public school in, or a private school accredited by, the Commonwealth of Puerto Rico in which the language of instruction was other than English shall be denied the right to vote in any election because of his inability to read or write English. Appellees, registered voters in New York City, brought this suit to challenge the constitutionality of § 4 (e) insofar as it *pro tanto* prohibits

---

[1] The full text of § 4 (e) is as follows:

"(1) Congress hereby declares that to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language.

"(2) No person who demonstrates that he has successfully completed the sixth primary grade in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language, except that in States in which State law provides that a different level of education is presumptive of literacy, he shall demonstrate that he has successfully completed an equivalent level of education in a public school in, or a private school accredited by, any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English." 79 Stat. 439, 42 U. S. C. § 1973b (e) (1964 ed., Supp. I).

the enforcement of the election laws of New York [2] requiring an ability to read and write English as a condition of voting. Under these laws many of the several hundred thousand New York City residents who have migrated there from the Commonwealth of Puerto Rico had previously been denied the right to vote, and appellees attack § 4 (e) insofar as it would enable many of

[2] Article II, § 1, of the New York Constitution provides, in pertinent part:

"Notwithstanding the foregoing provisions, after January first, one thousand nine hundred twenty-two, no person shall become entitled to vote by attaining majority, by naturalization or otherwise, unless such person is also able, except for physical disability, to read and write English."

Section 150 of the New York Election Law provides, in pertinent part:

". . . In the case of a person who became entitled to vote in this state by attaining majority, by naturalization or otherwise after January first, nineteen hundred twenty-two, such person must, in addition to the foregoing provisions, be able, except for physical disability, to read and write English. A 'new voter,' within the meaning of this article, is a person who, if he is entitled to vote in this state, shall have become so entitled on or after January first, nineteen hundred twenty-two, and who has not already voted at a general election in the state of New York after making proof of ability to read and write English, in the manner provided in section one hundred sixty-eight."

Section 168 of the New York Election Law provides, in pertinent part:

"1. The board of regents of the state of New York shall make provisions for the giving of literacy tests.

. . . . .

"2. . . . But a new voter may present as evidence of literacy a certificate or diploma showing that he has completed the work up to and including the sixth grade of an approved elementary school or of an approved higher school in which English is the language of instruction or a certificate or diploma showing that he has completed the work up to and including the sixth grade in a public school or a private school accredited by the Commonwealth of

these citizens to vote.[3]   Pursuant to § 14 (b) of the Voting Rights Act of 1965, appellees commenced this proceeding in the District Court for the District of Columbia seeking a declaration that § 4 (e) is invalid and an injunction prohibiting appellants, the Attorney General of the United States and the New York City Board of Elections, from either enforcing or complying with

Puerto Rico in which school instruction is carried on predominantly in the English language or a matriculation card issued by a college or university to a student then at such institution or a certificate or a letter signed by an official of the university or college certifying to such attendance."

Section 168 of the Election Law as it now reads was enacted while § 4 (e) was under consideration in Congress. See 111 Cong. Rec. 19376–19377. The prior law required the successful completion of the eighth rather than the sixth grade in a school in which the language of instruction was English.

[3] This limitation on appellees' challenge to § 4 (e), and thus on the scope of our inquiry, does not distort the primary intent of § 4 (e). The measure was sponsored in the Senate by Senators Javits and Kennedy and in the House by Representatives Gilbert and Ryan, all of New York, for the explicit purpose of dealing with the disenfranchisement of large segments of the Puerto Rican population in New York. Throughout the congressional debate it was repeatedly acknowledged that § 4 (e) had particular reference to the Puerto Rican population in New York. That situation was the almost exclusive subject of discussion. See 111 Cong. Rec. 11028, 11060–11074, 15666, 16235–16245, 16282–16283, 19192–19201, 19375–19378; see also Voting Rights, Hearings before Subcommittee No. 5 of the House Committee on the Judiciary on H. R. 6400, 89th Cong., 1st Sess., 100–101, 420–421, 508–517 (1965). The Solicitor General informs us in his brief to this Court, that in all probability the practical effect of § 4 (e) will be limited to enfranchising those educated in Puerto Rican schools. He advises us that, aside from the schools in the Commonwealth of Puerto Rico, there are no public or parochial schools in the territorial limits of the United States in which the predominant language of instruction is other than English and which would have generally been attended by persons who are otherwise qualified to vote save for their lack of literacy in English.

§ 4 (e).[4]   A three-judge district court was designated. 28 U. S. C. §§ 2282, 2284 (1964 ed.).   Upon cross motions for summary judgment, that court, one judge dissenting, granted the declaratory and injunctive relief appellees sought.   The court held that in enacting § 4 (e) Congress exceeded the powers granted to it by the Constitution and therefore usurped powers reserved to the States by the Tenth Amendment.   247 F. Supp. 196. Appeals were taken directly to this Court, 28 U. S. C. §§ 1252, 1253 (1964 ed.), and we noted probable jurisdiction.   382 U. S. 1007.   We reverse.   We hold that, in the application challenged in these cases, § 4 (e) is a proper exercise of the powers granted to Congress by § 5 of the Fourteenth Amendment [5] and that by force of the

---

[4] Section 14 (b) provides, in pertinent part:

"No court other than the District Court for the District of Columbia . . . shall have jurisdiction to issue . . . any restraining order or temporary or permanent injunction against the . . . enforcement of any provision of this Act or any action of any Federal officer or employee pursuant hereto."   79 Stat. 445, 42 U. S. C. § 1973*l* (b) (1964 ed., Supp. I).

The Attorney General of the United States was initially named as the sole defendant.   The New York City Board of Elections was joined as a defendant after it publicly announced its intention to comply with § 4 (e); it has taken the position in these proceedings that § 4 (e) is a proper exercise of congressional power.   The Attorney General of the State of New York has participated as *amicus curiae* in the proceedings below and in this Court, urging § 4 (e) be declared unconstitutional.   The United States was granted leave to intervene as a defendant, 28 U. S. C. § 2403 (1964 ed.); Fed. Rule Civ. Proc. 24 (a).

[5] "SECTION 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

It is therefore unnecessary for us to consider whether § 4 (e) could be sustained as an exercise of power under the Territorial Clause, Art. IV, § 3; see dissenting opinion of Judge McGowan below, 247 F. Supp., at 204; or as a measure to discharge certain treaty obligations of the United States, see Treaty of Paris of 1898, 30 Stat. 1754, 1759; United Nations Charter, Articles 55 and 56;

Supremacy Clause, Article VI, the New York English literacy requirement cannot be enforced to the extent that it is inconsistent with § 4 (e).

Under the distribution of powers effected by the Constitution, the States establish qualifications for voting for state officers, and the qualifications established by the States for voting for members of the most numerous branch of the state legislature also determine who may vote for United States Representatives and Senators, Art. I, § 2; Seventeenth Amendment; *Ex parte Yarbrough*, 110 U. S. 651, 663. But, of course, the States have no power to grant or withhold the franchise on conditions that are forbidden by the Fourteenth Amendment, or any other provision of the Constitution. Such exercises of state power are no more immune to the limitations of the Fourteenth Amendment than any other state action. The Equal Protection Clause itself has been held to forbid some state laws that restrict the right to vote.[6]

---

Art. I, § 8, cl. 18. Nor need we consider whether § 4 (e) could be sustained insofar as it relates to the election of federal officers as an exercise of congressional power under Art. I, § 4, see *Minor* v. *Happersett*, 21 Wall. 162, 171; *United States* v. *Classic*, 313 U. S. 299, 315; Literacy Tests and Voter Requirements in Federal and State Elections, Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on S. 480, S. 2750, and S. 2979, 87th Cong., 2d Sess., 302, 306–311 (1962) (brief of the Attorney General); nor whether § 4 (e) could be sustained, insofar as it relates to the election of state officers, as an exercise of congressional power to enforce the clause guaranteeing to each State a republican form of government, Art. IV, § 4; Art. I, § 8, cl. 18.

[6] *Harper* v. *Virginia Board of Elections*, 383 U. S. 663; *Carrington* v. *Rash*, 380 U. S. 89. See also *United States* v. *Mississippi*, 380 U. S. 128; *Louisiana* v. *United States*, 380 U. S. 145, 151; *Lassiter* v. *Northampton Election Bd.*, 360 U. S. 45; *Pope* v. *Williams*, 193 U. S. 621, 632–634; *Minor* v. *Happersett*, 21 Wall. 162; cf. *Burns* v. *Richardson, ante*, p. 73, at 92; *Reynolds* v. *Sims*, 377 U. S. 533.

648

The Attorney General of the State of New York argues that an exercise of congressional power under § 5 of the Fourteenth Amendment that prohibits the enforcement of a state law can only be sustained if the judicial branch determines that the state law is prohibited by the provisions of the Amendment that Congress sought to enforce. More specifically, he urges that § 4 (e) cannot be sustained as appropriate legislation to enforce the Equal Protection Clause unless the judiciary decides—even with the guidance of a congressional judgment—that the application of the English literacy requirement prohibited by § 4 (e) is forbidden by the Equal Protection Clause itself. We disagree. Neither the language nor history of § 5 supports such a construction.[7] As was said with regard to § 5 in *Ex parte Virginia*, 100 U. S. 339, 345, "It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective." A construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment.[8] It would confine the legislative power

---

[7] For the historical evidence suggesting that the sponsors and supporters of the Amendment were primarily interested in augmenting the power of Congress, rather than the judiciary, see generally Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L. J. 1353, 1356–1357; Harris, The Quest for Equality, 33–56 (1960); tenBroek, The Antislavery Origins of the Fourteenth Amendment 187–217 (1951).

[8] Senator Howard, in introducing the proposed Amendment to the Senate, described § 5 as "a direct affirmative delegation of power to Congress," and added:

"It casts upon Congress the responsibility of seeing to it, for the future, that all the sections of the amendment are carried out in

in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the "majestic generalities" of § 1 of the Amendment. See *Fay* v. *New York,* 332 U. S. 261, 282–284.

Thus our task in this case is not to determine whether the New York English literacy requirement as applied to deny the right to vote to a person who successfully completed the sixth grade in a Puerto Rican school violates the Equal Protection Clause. Accordingly, our decision in *Lassiter* v. *Northampton Election Bd.,* 360 U. S. 45, sustaining the North Carolina English literacy requirement as not in all circumstances prohibited by the first sections of the Fourteenth and Fifteenth Amendments, is inapposite. Compare also *Guinn* v. *United States,* 238 U. S. 347, 366; *Camacho* v. *Doe,* 31 Misc. 2d 692, 221 N. Y. S. 2d 262 (1958), aff'd 7 N. Y. 2d 762, 163 N. E. 2d 140 (1959); *Camacho* v. *Rogers,* 199 F. Supp. 155 (D. C. S. D. N. Y. 1961). *Lassiter* did not present the question before us here: Without regard to whether the judiciary would find that the Equal Protection Clause itself nullifies New York's English literacy requirement as so applied, could Congress prohibit the enforcement of the state law by legislating under § 5 of the Fourteenth Amendment? In answering this question, our task is limited to determining whether such

good faith, and that no State infringes the rights of persons or property. I look upon this clause as indispensable for the reason that it thus imposes upon Congress this power and this duty. It enables Congress, in case the States shall enact laws in conflict with the principles of the amendment, to correct that legislation by a formal congressional enactment." Cong. Globe, 39th Cong., 1st Sess., 2766, 2768 (1866).

This statement of § 5's purpose was not questioned by anyone in the course of the debate. Flack, The Adoption of the Fourteenth Amendment 138 (1908).

legislation is, as required by § 5, appropriate legislation to enforce the Equal Protection Clause.

By including § 5 the draftsmen sought to grant to Congress, by a specific provision applicable to the Fourteenth Amendment, the same broad powers expressed in the Necessary and Proper Clause, Art. I, § 8, cl. 18.[9]  The classic formulation of the reach of those powers was established by Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 421:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

*Ex parte Virginia,* 100 U. S., at 345–346, decided 12 years after the adoption of the Fourteenth Amendment, held that congressional power under § 5 had this same broad scope:

> "Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power."

---

[9] In fact, earlier drafts of the proposed Amendment employed the "necessary and proper" terminology to describe the scope of congressional power under the Amendment.  See tenBroek, The Antislavery Origins of the Fourteenth Amendment 187–190 (1951).  The substitution of the "appropriate legislation" formula was never thought to have the effect of diminishing the scope of this congressional power.  See, *e. g.,* Cong. Globe, 42d Cong., 1st Sess., App. 83 (Representative Bingham, a principal draftsman of the Amendment and the earlier proposals).

*Strauder* v. *West Virginia,* 100 U. S. 303, 311; *Virginia* v. *Rives,* 100 U. S. 313, 318. Section 2 of the Fifteenth Amendment grants Congress a similar power to enforce by "appropriate legislation" the provisions of that amendment; and we recently held in *South Carolina* v. *Katzenbach,* 383 U. S. 301, 326, that "[t]he basic test to be applied in a case involving § 2 of the Fifteenth Amendment is the same as in all cases concerning the express powers of Congress with relation to the reserved powers of the States." That test was identified as the one formulated in *McCulloch* v. *Maryland.* See also *James Everard's Breweries* v. *Day,* 265 U. S. 545, 558–559 (Eighteenth Amendment). Thus the *McCulloch* v. *Maryland* standard is the measure of what constitutes "appropriate legislation" under § 5 of the Fourteenth Amendment. Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment.

We therefore proceed to the consideration whether § 4 (e) is "appropriate legislation" to enforce the Equal Protection Clause, that is, under the *McCulloch* v. *Maryland* standard, whether § 4 (e) may be regarded as an enactment to enforce the Equal Protection Clause, whether it is "plainly adapted to that end" and whether it is not prohibited by but is consistent with "the letter and spirit of the constitution." [10]

---

[10] Contrary to the suggestion of the dissent, *post,* p. 668, § 5 does not grant Congress power to exercise discretion in the other direction and to enact "statutes so as in effect to dilute equal protection and due process decisions of this Court." We emphasize that Congress' power under § 5 is limited to adopting measures to enforce the guarantees of the Amendment; § 5 grants Congress no power to restrict, abrogate, or dilute these guarantees. Thus, for example, an enactment authorizing the States to establish racially segregated sys-

There can be no doubt that § 4 (e) may be regarded as an enactment to enforce the Equal Protection Clause. Congress explicitly declared that it enacted § 4 (e) "to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English." The persons referred to include those who have migrated from the Commonwealth of Puerto Rico to New York and who have been denied the right to vote because of their inability to read and write English, and the Fourteenth Amendment rights referred to include those emanating from the Equal Protection Clause. More specifically, § 4 (e) may be viewed as a measure to secure for the Puerto Rican community residing in New York non-discriminatory treatment by government—both in the imposition of voting qualifications and the provision or administration of governmental services, such as public schools, public housing and law enforcement.

Section 4 (e) may be readily seen as "plainly adapted" to furthering these aims of the Equal Protection Clause. The practical effect of § 4 (e) is to prohibit New York from denying the right to vote to large segments of its Puerto Rican community. Congress has thus prohibited the State from denying to that community the right that is "preservative of all rights." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370. This enhanced political power will be helpful in gaining nondiscriminatory treatment in public services for the entire Puerto Rican community.[11] Sec-

tems of education would not be—as required by § 5—a measure "to enforce" the Equal Protection Clause since that clause of its own force prohibits such state laws.

[11] Cf. *James Everard's Breweries* v. *Day, supra,* which held that, under the Enforcement Clause of the Eighteenth Amendment, Congress could prohibit the prescription of intoxicating malt liquor for medicinal purposes even though the Amendment itself only prohibited the manufacture and sale of intoxicating liquors for beverage purposes. Cf. also the settled principle applied in the *Shreveport*

tion 4 (e) thereby enables the Puerto Rican minority better to obtain "perfect equality of civil rights and the equal protection of the laws." It was well within congressional authority to say that this need of the Puerto Rican minority for the vote warranted federal intrusion upon any state interests served by the English literacy requirement. It was for Congress, as the branch that made this judgment, to assess and weigh the various conflicting considerations—the risk or pervasiveness of the discrimination in governmental services, the effectiveness of eliminating the state restriction on the right to vote as a means of dealing with the evil, the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected by the nullification of the English literacy requirement as applied to residents who have successfully completed the sixth grade in a Puerto Rican school. It is not for us to review the congressional resolution of these factors. It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did. There plainly was such a basis to support § 4 (e) in the application in question in this case. Any contrary conclusion would require us to be blind to the realities familiar to the legislators.[12]

The result is no different if we confine our inquiry to the question whether § 4 (e) was merely legislation aimed

---

*Case (Houston, E. & W. T. R. Co.* v. *United States,* 234 U. S. 342), and expressed in *United States* v. *Darby,* 312 U. S. 100, 118, that the power of Congress to regulate interstate commerce "extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end . . . ." Accord, *Atlanta Motel* v. *United States,* 379 U. S. 241, 258.

[12] See, *e. g.,* 111 Cong. Rec. 11061–11062, 11065–11066, 16240; Literacy Tests and Voter Requirements in Federal and State Elections, Senate Hearings, n. 5, *supra,* 507–508.

at the elimination of an invidious discrimination in establishing voter qualifications. We are told that New York's English literacy requirement originated in the desire to provide an incentive for non-English speaking immigrants to learn the English language and in order to assure the intelligent exercise of the franchise. Yet Congress might well have questioned, in light of the many exemptions provided,[13] and some evidence suggesting that prejudice played a prominent role in the enactment of the requirement,[14] whether these were actually the interests being served. Congress might have also questioned whether denial of a right deemed so precious and fundamental in our society was a necessary or appropriate means of encouraging persons to learn English, or of furthering the goal of an intelligent exercise of the franchise.[15] Finally, Congress might well have concluded that

---

[13] The principal exemption complained of is that for persons who had been eligible to vote before January 1, 1922. See n. 2, *supra*.

[14] This evidence consists in part of statements made in the Constitutional Convention first considering the English literacy requirement, such as the following made by the sponsor of the measure: "More precious even than the forms of government are the mental qualities of our race. While those stand unimpaired, all is safe. They are exposed to a single danger, and that is that by constantly changing our voting citizenship through the wholesale, but valuable and necessary infusion of Southern and Eastern European races . . . . The danger has begun. . . . We should check it." III New York State Constitutional Convention 3012 (Rev. Record 1916). See also *id.*, at 3015–3017, 3021–3055. This evidence was reinforced by an understanding of the cultural milieu at the time of proposal and enactment, spanning a period from 1915 to 1921—not one of the enlightened eras of our history. See generally Chafee, Free Speech in the United States 102, 237, 269–282 (1954 ed.). Congress was aware of this evidence. See, *e. g.*, Literacy Tests and Voter Requirements in Federal and State Elections, Senate Hearings, n. 5, *supra*, 507–513; Voting Rights, House Hearings, n. 3, *supra*, 508–513.

[15] Other States have found ways of assuring an intelligent exercise of the franchise short of total disenfranchisement of persons not

as a means of furthering the intelligent exercise of the franchise, an ability to read or understand Spanish is as effective as ability to read English for those to whom Spanish-language newspapers and Spanish-language radio and television programs are available to inform them of election issues and governmental affairs.[16]  Since Congress undertook to legislate so as to preclude the enforcement of the state law, and did so in the context of a general appraisal of literacy requirements for voting, see

literate in English.  For example, in Hawaii, where literacy in either English or Hawaiian suffices, candidates' names may be printed in both languages, Hawaii Rev. Laws § 11–38 (1963 Supp.); New York 'itself already provides assistance for those exempt from the literacy requirement and are literate in no language, N. Y. Election Law § 169; and, of course, the problem of assuring the intelligent exercise of the franchise has been met by those States, more than 30 in number, that have no literacy requirement at all, see e. g., Fla. Stat. Ann. §§ 97.061, 101.061 (1960) (form of personal assistance); New Mexico Stat. Ann. §§ 3–2–11, 3–3–13 (personal assistance for those literate in no language), §§ 3–3–7, 3–3–12, 3–2–41 (1953) (ballots and instructions authorized to be printed in English or Spanish). Section 4 (e) does not preclude resort to these alternative methods of assuring the intelligent exercise of the franchise.  True, the statute precludes, for a certain class, disenfranchisement and thus limits the States' choice of means of satisfying a purported state interest.  But our cases have held that the States can be required to tailor carefully the means of satisfying a legitimate state interest when fundamental liberties and rights are threatened, see, e. g., Carrington v. Rash, 380 U. S. 89, 96; Harper v. Virginia Board of Elections, 383 U. S. 663, 670; Thomas v. Collins, 323 U. S. 516, 529–530; Thornhill v. Alabama, 310 U. S. 88, 95–96; United States v. Carolene Products Co., 304 U. S. 144, 152–153, n. 4; Meyer v. Nebraska, 262 U. S. 390; and Congress is free to apply the same principle in the exercise of its powers.

[16] See, e. g., 111 Cong. Rec. 11060–11061, 15666, 16235.  The record in this case includes affidavits describing the nature of New York's two major Spanish-language newspapers, one daily and one weekly, and its three full-time Spanish-language radio stations and affidavits from those who have campaigned in Spanish-speaking areas.

*South Carolina* v. *Katzenbach, supra,* to which it brought a specially informed legislative competence,[17] it was Congress' prerogative to weigh these competing considerations. Here again, it is enough that we perceive a basis upon which Congress might predicate a judgment that the application of New York's English literacy requirement to deny the right to vote to a person with a sixth grade education in Puerto Rican schools in which the language of instruction was other than English constituted an invidious discrimination in violation of the Equal Protection Clause.

There remains the question whether the congressional remedies adopted in § 4 (e) constitute means which are not prohibited by, but are consistent "with the letter and spirit of the constitution." The only respect in which appellees contend that § 4 (e) fails in this regard is that the section itself works an invidious discrimination in violation of the Fifth Amendment by prohibiting the enforcement of the English literacy requirement only for those educated in American-flag schools (schools located within United States jurisdiction) in which the language of instruction was other than English, and not for those educated in schools beyond the territorial limits of the United States in which the language of instruction was also other than English. This is not a complaint that Congress, in enacting § 4 (e), has unconstitutionally denied or diluted anyone's right to vote but rather that Congress violated the Constitution by not extending the

---

[17] See, *e. g.,* 111 Cong. Rec. 11061 (Senator Long of Louisiana and Senator Young), 11064 (Senator Holland), drawing on their experience with voters literate in a language other than English. See also an affidavit from Representative Willis of Louisiana expressing the view that on the basis of his thirty years' personal experience in politics he has "formed a definite opinion that French-speaking voters who are illiterate in English generally have as clear a grasp of the issues and an understanding of the candidates, as do people who read and write the English language."

relief effected in § 4 (e) to those educated in non-American-flag schools. We need not pause to determine whether appellees have a sufficient personal interest to have § 4 (e) invalidated on this ground, see generally *United States* v. *Raines,* 362 U. S. 17, since the argument, in our view, falls on the merits.

Section 4 (e) does not restrict or deny the franchise but in effect extends the franchise to persons who otherwise would be denied it by state law. Thus we need not decide whether a state literacy law conditioning the right to vote on achieving a certain level of education in an American-flag school (regardless of the language of instruction) discriminates invidiously against those educated in non-American-flag schools. We need only decide whether the challenged limitation on the relief effected in § 4 (e) was permissible. In deciding that question, the principle that calls for the closest scrutiny of distinctions in laws *denying* fundamental rights, see n. 15, *supra,* is inapplicable; for the distinction challenged by appellees is presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise. Rather, in deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did," *Roschen* v. *Ward,* 279 U. S. 337, 339, that a legislature need not "strike at all evils at the same time," *Semler* v. *Dental Examiners,* 294 U. S. 608, 610, and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489.

Guided by these principles, we are satisfied that appellees' challenge to this limitation in § 4 (e) is without merit. In the context of the case before us, the congressional choice to limit the relief effected in § 4 (e) may,

for example, reflect Congress' greater familiarity with the quality of instruction in American-flag schools, [18] a recognition of the unique historic relationship between the Congress and the Commonwealth of Puerto Rico,[19] an awareness of the Federal Government's acceptance of the desirability of the use of Spanish as the language of instruction in Commonwealth schools,[20] and the fact that Congress has fostered policies encouraging migration from the Commonwealth to the States.[21] We have no occasion to determine in this case whether such factors would justify a similar distinction embodied in a voting-qualification law that denied the franchise to persons educated in non-American-flag schools. We hold only that the limitation on relief effected in § 4 (e) does not constitute a forbidden discrimination since these factors might well have been the basis for the decision of Congress to go "no farther than it did."

We therefore conclude that § 4 (e), in the application challenged in this case, is appropriate legislation to enforce the Equal Protection Clause and that the judgment of the District Court must be and hereby is

*Reversed.*

MR. JUSTICE DOUGLAS joins the Court's opinion except for the discussion, at pp. 656–658, of the question whether the congressional remedies adopted in § 4 (e) constitute means which are not prohibited by, but are consistent with "the letter and spirit of the constitution." On that

---

[18] See, *e. g.*, 111 Cong. Rec. 11060–11061.

[19] See Magruder, The Commonwealth Status of Puerto Rico, 15 U. Pitt. L. Rev. 1 (1953).

[20] See, *e. g.*, 111 Cong. Rec. 11060–11061, 11066, 11073, 16235. See Osuna, A History of Education in Puerto Rico (1949).

[21] See, *e. g.*, 111 Cong. Rec. 16235; Voting Rights, House Hearings, n. 3, *supra*, 362. See also Jones Act of 1917, 39 Stat. 953, conferring United States citizenship on all citizens of Puerto Rico.

question, he reserves judgment until such time as it is presented by a member of the class against which that particular discrimination is directed.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.[*]

Worthy as its purposes may be thought by many, I do not see how § 4 (e) of the Voting Rights Act of 1965, 79 Stat. 439, 42 U. S. C. § 1973b (e) (1964 ed. Supp. I), can be sustained except at the sacrifice of fundamentals in the American constitutional system—the separation between the legislative and judicial function and the boundaries between federal and state political authority. By the same token I think that the validity of New York's literacy test, a question which the Court considers *only* in the context of the federal statute, must be upheld. It will conduce to analytical clarity if I discuss the second issue first.

I.

*The Cardona Case* (No. 673).

This case presents a straightforward Equal Protection problem. Appellant, a resident and citizen of New York, sought to register to vote but was refused registration because she failed to meet the New York English literacy qualification respecting eligibility for the franchise.[1] She maintained that although she could not read or write English, she had been born and educated in Puerto Rico and was literate in Spanish. She alleges that New York's statute requiring satisfaction of an English literacy test is an arbitrary and irrational classification that violates the

---

[*][This opinion applies also to *Cardona* v. *Power, post,* p. 672.]

[1] The pertinent portions of the New York Constitution, Art. II, § 1, and statutory provisions are reproduced in the Court's opinion, *ante,* pp. 644–645, n. 2.

Equal Protection Clause at least as applied to someone who, like herself, is literate in Spanish.

Any analysis of this problem must begin with the established rule of law that the franchise is essentially a matter of state concern, *Minor* v. *Happersett,* 21 Wall. 162; *Lassiter* v. *Northampton Election Bd.,* 360 U. S. 45, subject only to the overriding requirements of various federal constitutional provisions dealing with the franchise, *e. g.,* the Fifteenth, Seventeenth, Nineteenth, and Twenty-fourth Amendments,[2] and, as more recently decided, to the general principles of the Fourteenth Amendment. *Reynolds* v. *Sims,* 377 U. S. 533; *Carrington* v. *Rash,* 380 U. S. 89.

The Equal Protection Clause of the Fourteenth Amendment, which alone concerns us here, forbids a State from arbitrarily discriminating among different classes of persons. Of course it has always been recognized that nearly all legislation involves some sort of classification, and the equal protection test applied by this Court is a narrow one: a state enactment or practice may be struck down under the clause only if it cannot be justified as founded upon a rational and permissible state policy. See, *e. g:, Powell* v. *Pennsylvania,* 127 U. S. 678; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61; *Walters* v. *City of St. Louis,* 347 U. S. 231.

It is suggested that a different and broader equal protection standard applies in cases where "fundamental liberties and rights are threatened," see *ante,* p. 655, note 15; dissenting opinion of DOUGLAS, J., in *Cardona, post,*

---

[2] The Fifteenth Amendment forbids denial or abridgment of the franchise "on account of race, color, or previous condition of servitude"; the Seventeenth deals with popular election of members of the Senate; the Nineteenth provides for equal suffrage for women; the Twenty-fourth outlaws the poll tax as a qualification for participation in federal elections.

pp. 676–677, which would require a State to show a need greater than mere rational policy to justify classifications in this area. No such dual-level test has ever been articulated by this Court, and I do not believe that any such approach is consistent with the purposes of the Equal Protection Clause, with the overwhelming weight of authority, or with well-established principles of federalism which underlie the Equal Protection Clause.

Thus for me, applying the basic equal protection standard, the issue in this case is whether New York has shown that its English-language literacy test is reasonably designed to serve a legitimate state interest. I think that it has.

In 1959, in *Lassiter* v. *Northampton Election Bd.,* *supra,* this Court dealt with substantially the same question and resolved it unanimously in favor of the legitimacy of a state literacy qualification. There a North Carolina English literacy test was challenged. We held that there was "wide scope" for State qualifications of this sort. 360 U. S., at 51. Dealing with literacy tests generally, the Court there held:

> "The ability to read and write . . . has some relation to standards designed to promote intelligent use of the ballot. . . . Literacy and intelligence are obviously not synonymous. Illiterate people may be intelligent voters. Yet in our society where newspapers, periodicals, books, and other printed matter canvass and debate campaign issues, a State might conclude that only those who are literate should exercise the franchise. . . . It was said last century in Massachusetts that a literacy test was designed to insure an 'independent and intelligent' exercise of the right of suffrage. *Stone* v. *Smith,* 159 Mass. 413–414, 34 N. E. 521. North Carolina agrees. We do not sit in judgment on the wisdom of that

policy. We cannot say, however, that it is not an allowable one measured by constitutional standards." 360 U. S., at 51–53.

I believe the same interests recounted in *Lassiter* indubitably point toward upholding the rationality of the New York voting test. It is true that the issue here is not so simply drawn between literacy *per se* and illiteracy. Appellant alleges that she is literate in Spanish, and that she studied American history and government in United States Spanish-speaking schools in Puerto Rico. She alleges further that she is "a regular reader of the New York City Spanish-language daily newspapers and other periodicals, which . . . provide proportionately more coverage of government and politics than do most English-language newspapers," and that she listens to Spanish-language radio broadcasts in New York which provide full treatment of governmental and political news. It is thus maintained that whatever may be the validity of literacy tests *per se* as a condition of voting, application of such a test to one literate in Spanish, in the context of the large and politically significant Spanish-speaking community in New York, serves no legitimate state interest, and is thus an arbitrary classification that violates the Equal Protection Clause.

Although to be sure there is a difference between a totally illiterate person and one who is literate in a foreign tongue, I do not believe that this added factor vitiates the constitutionality of the New York statute. Accepting appellant's allegations as true, it is nevertheless also true that the range of material available to a resident of New York literate only in Spanish is much more limited than what is available to an English-speaking resident, that the business of national, state, and local government is conducted in English, and that propositions, amendments, and offices for which candidates are running listed on the ballot are likewise in English. It

is also true that most candidates, certainly those campaigning on a national or statewide level, make their speeches in English. New York may justifiably want its voters to be able to understand candidates directly, rather than through possibly imprecise translations or summaries reported in a limited number of Spanish news media. It is noteworthy that the Federal Government requires literacy in English as a prerequisite to naturalization, 66 Stat. 239, 8 U. S. C. § 1423 (1964 ed.), attesting to the national view of its importance as a prerequisite to full integration into the American political community. Relevant too is the fact that the New York English test is not complex,[3] that it is fairly adminis-

---

[3] The test is described in McGovney, The American Suffrage Medley 63 (1949) as follows: "The examination is based upon prose compositions of about ten lines each, prepared by the personnel of the State Department of Education, designed to be of the level of reading in the sixth grade . . . . These are uniform for any single examination throughout the state. The examination is given by school authorities and graded by school superintendents or teachers under careful instructions from the central authority, to secure uniformity of grading as nearly as is possible." The 1943 test, submitted by the Attorney General of New York as representative, is reproduced below:

NEW YORK STATE REGENTS LITERACY TEST
(To be filled in by the candidate in ink)

Write your name here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        First name  Middle initial  Last name
Write your address here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Write the date here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      Month    Day    Year

Read this and then write the answers to the questions
Read it as many times as you need to

The legislative branch of the National Government is called the Congress of the United States. Congress makes the laws of the Nation. Congress is composed of two houses. The upper house is called the Senate and its members are called Senators. There are 96 Senators in the upper house, two from each State. Each United

tered,[4] and that New York maintains free adult education classes which appellant and members of her class are encouraged to attend.[5] Given the State's legitimate concern with promoting and safeguarding the intelligent use of the ballot, and given also New York's long experience with the process of integrating non-English-speaking residents into the mainstream of American life, I do not see how it can be said that this qualification for suffrage is unconstitutional. I would uphold the validity of the New York statute, unless the federal statute prevents that result, the question to which I now turn.

States Senator is elected for a term of six years. The lower house of Congress is known as the House of Representatives. The number of Representatives from each state is determined by the population of that state. At present there are 435 members of the House of Representatives. Each Representative is elected for a term of two years. Congress meets in the Capitol at Washington.

The answers to the following questions are to be taken from the above paragraph

1  How many houses are there in Congress? ...................
2  What does Congress do? ....................................
3  What is the lower house of Congress called ?...............
4  How many members are there in the lower house? ...........
5  How long is the term of office of a United States Senator? ......
6  How many Senators are there from each state? ............
7  For how long a period are members of the House of Representatives elected? ..........................................
8  In what city does Congress meet? .........................

[4] There is no allegation of discriminatory enforcement, and the method of examination, see n. 3, *supra,* makes unequal application virtually impossible. McGovney has noted, *op. cit. supra,* at 62, that "New York is the only state in the Union that both has a reasonable reading requirement and administers it in a manner that secures uniformity of application throughout the state and precludes discrimination, so far as is humanly possible." See *Camacho* v. *Rogers,* 199 F. Supp. 155, 159–160.

[5] See McKinney's Consolidated Laws of New York Ann., Education Law § 4605. See generally Handbook of Adult Education in the United States 455–465 (Knowles ed. 1960).

## II.

### *The Morgan Cases* (Nos. 847 and 877).

These cases involve the same New York suffrage restriction discussed above, but the challenge here comes not in the form of a suit to enjoin enforcement of the state statute, but in a test of the constitutionality of a federal enactment which declares that "to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language." Section 4 (e) of the Voting Rights Act of 1965. Section 4 (e) declares that anyone who has successfully completed six grades of schooling in an "American-flag" school, in which the primary language is not English, shall not be denied the right to vote because of an inability to satisfy an English literacy test.[6] Although the statute is framed in general terms, so far as has been shown it applies in actual effect only to citizens of Puerto Rican background, and the Court so treats it.

The pivotal question in this instance is what effect the added factor of a congressional enactment has on the straight equal protection argument dealt with above. The Court declares that since § 5 of the Fourteenth Amendment[7] gives to the Congress power to "enforce"

---

[6] The statute makes an exception to its sixth-grade rule so that where state law "provides that a different level of education is presumptive of literacy," the applicant must show that he has completed "an equivalent level of education" in the foreign-language United States school.

[7] Section 5 of the Fourteenth Amendment states that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

the prohibitions of the Amendment by "appropriate" legislation, the test for judicial review of any congressional determination in this area is simply one of rationality; that is, in effect, was Congress acting rationally in declaring that the New York statute is irrational? Although § 5 most certainly does give to the Congress wide powers in the field of devising remedial legislation to effectuate the Amendment's prohibition on arbitrary state action, *Ex parte Virginia,* 100 U. S. 339, I believe the Court has confused the issue of how much enforcement power Congress possesses under § 5 with the distinct issue of what questions are appropriate for congressional determination and what questions are essentially judicial in nature.

When recognized state violations of federal constitutional standards have occurred, Congress is of course empowered by § 5 to take appropriate remedial measures to redress and prevent the wrongs. See *Strauder* v. *West Virginia,* 100 U. S. 303, 310. But it is a judicial question whether the condition with which Congress has thus sought to deal is in truth an infringement of the Constitution, something that is the necessary prerequisite to bringing the § 5 power into play at all. Thus, in *Ex parte Virginia, supra,* involving a federal statute making it a federal crime to disqualify anyone from jury service because of race, the Court first held as a matter of constitutional law that "the Fourteenth Amendment secures, among other civil rights, to colored men, when charged with criminal offences against a State, an impartial jury trial, by jurors indifferently selected or chosen without discrimination against such jurors because of their color." 100 U. S., at 345. Only then did the Court hold that to enforce this prohibition upon state discrimination, Congress could enact a criminal statute of the type under consideration. See also *Clyatt* v. *United States,* 197 U. S. 207, sustaining the constitutionality of the anti-

peonage laws, 14 Stat. 546, now 42 U. S. C. § 1994 (1964 ed.), under the Enforcement Clause of the Thirteenth Amendment.

A more recent Fifteenth Amendment case also serves to illustrate this distinction. In *South Carolina* v. *Katzenbach,* 383 U. S. 301, decided earlier this Term, we held certain remedial sections of this Voting Rights Act of 1965 constitutional under the Fifteenth Amendment, which is directed against deprivations of the right to vote on account of race. In enacting those sections of the Voting Rights Act the Congress made a detailed investigation of various state practices that had been used to deprive Negroes of the franchise. See 383 U. S., at 308–315. In passing upon the remedial provisions, we reviewed first the "voluminous legislative history" as well as judicial precedents supporting the basic congressional finding that the clear commands of the Fifteenth Amendment had been infringed by various state subterfuges. See 383 U. S., at 309, 329–330, 333–334. Given the existence of the evil, we held the remedial steps taken by the legislature under the Enforcement Clause of the Fifteenth Amendment to be a justifiable exercise of congressional initiative.

Section 4 (e), however, presents a significantly different type of congressional enactment. The question here is not whether the statute is appropriate remedial legislation to cure an established violation of a constitutional command, but whether there has in fact been an infringement of that constitutional command, that is, whether a particular state practice or, as here, a statute is so arbitrary or irrational as to offend the command of the Equal Protection Clause of the Fourteenth Amendment. That question is one for the judicial branch ultimately to determine. Were the rule otherwise, Congress would be able to qualify this Court's constitutional decisions under the Fourteenth and Fifteenth Amendments,

let alone those under other provisions of the Constitution, by resorting to congressional power under the Necessary and Proper Clause. In view of this Court's holding in *Lassiter, supra,* that an English literacy test is a permissible exercise of state supervision over its franchise, I do not think it is open to Congress to limit the effect of that decision as it has undertaken to do by § 4 (e). In effect the Court reads § 5 of the Fourteenth Amendment as giving Congress the power to define the *substantive* scope of the Amendment. If that indeed be the true reach of § 5, then I do not see why Congress should not be able as well to exercise its § 5 "discretion" by enacting statutes so as in effect to dilute equal protection and due process decisions of this Court. In all such cases there is room for reasonable men to differ as to whether or not a denial of equal protection or due process has occurred, and the final decision is one of judgment. Until today this judgment has always been one for the judiciary to resolve.

I do not mean to suggest in what has been said that a legislative judgment of the type incorporated in § 4 (e) is without any force whatsoever. Decisions on questions of equal protection and due process are based not on abstract logic, but on empirical foundations. To the extent "legislative facts" are relevant to a judicial determination, Congress is well equipped to investigate them, and such determinations are of course entitled to due respect.[8] In *South Carolina* v. *Katzenbach, supra,* such legislative findings were made to show that racial discrimination in voting was actually occurring. Similarly, in *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, and *Katzenbach* v. *McClung,* 379 U. S. 294, this Court upheld

---

[8] See generally Karst, Legislative Facts in Constitutional Litigation, 1960 The Supreme Court Review 75 (Kurland ed.); Alfange, The Relevance of Legislative Facts in Constitutional Law, 114 U. Pa. L. Rev. 637 (1966).

Title II of the Civil Rights Act of 1964 under the Commerce Clause. There again the congressional determination that racial discrimination in a clearly defined group of public accommodations did effectively impede interstate commerce was based on "voluminous testimony," 379 U. S., at 253, which had been put before the Congress and in the context of which it passed remedial legislation.

But no such factual data provide a legislative record supporting § 4 (e)[9] by way of showing that Spanish-speaking citizens are fully as capable of making informed decisions in a New York election as are English-speaking citizens. Nor was there any showing whatever to support the Court's alternative argument that § 4 (e) should be viewed as but a remedial measure designed to cure or assure against unconstitutional discrimination of other varieties, *e. g.*, in "public schools, public housing and law enforcement," *ante*, p. 652, to which Puerto Rican minorities might be subject in such communities as New York. There is simply no legislative record supporting such hypothesized discrimination of the sort we have hitherto insisted upon when congressional power is brought to bear on constitutionally reserved state concerns. See *Heart of Atlanta Motel, supra; South Carolina* v. *Katzenbach, supra.*

Thus, we have here not a matter of giving deference to a congressional estimate, based on its determination of legislative facts, bearing upon the validity *vel non* of a statute, but rather what can at most be called a legislative announcement that Congress believes a state law to entail an unconstitutional deprivation of equal protection. Although this kind of declaration is of course

---

[9] There were no committee hearings or reports referring to this section, which was introduced from the floor during debate on the full Voting Rights Act. See 111 Cong. Rec. 11027, 15666, 16234.

entitled to the most respectful consideration, coming as it does from a concurrent branch and one that is knowledgeable in matters of popular political participation, I do not believe it lessens our responsibility to decide the fundamental issue of whether in fact the state enactment violates federal constitutional rights.

In assessing the deference we should give to this kind of congressional expression of policy, it is relevant that the judiciary has always given to congressional enactments a presumption of validity. *The Propeller Genesee Chief* v. *Fitzhugh,* 12 How. 443, 457–458. However, it is also a canon of judicial review that state statutes are given a similar presumption, *Butler* v. *Commonwealth,* 10 How. 402, 415. Whichever way this case is decided, one statute will be rendered inoperative in whole or in part, and although it has been suggested that this Court should give somewhat more deference to Congress than to a state legislature,[10] such a simple weighing of presumptions is hardly a satisfying way of resolving a matter that touches the distribution of state and federal power in an area so sensitive as that of the regulation of the franchise. Rather it should be recognized that while the Fourteenth Amendment is a "brooding omnipresence" over all state legislation, the substantive matters which it touches are all within the primary legislative competence of the States. Federal authority, legislative no less than judicial, does not intrude unless there has been a denial by state action of Fourteenth Amendment limitations, in this instance a denial of equal protection. At least in the area of primary state concern a state statute that passes constitutional muster under the judicial standard of rationality should not be permitted to be set at naught by a mere contrary con-

---

[10] See Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv. L. Rev. 129, 154–155 (1893).

gressional pronouncement unsupported by a legislative record justifying that conclusion.

To deny the effectiveness of this congressional enactment is not of course to disparage Congress' exertion of authority in the field of civil rights; it is simply to recognize that the Legislative Branch like the other branches of federal authority is subject to the governmental boundaries set by the Constitution. To hold, on this record, that § 4 (e) overrides the New York literacy requirement seems to me tantamount to allowing the Fourteenth Amendment to swallow the State's constitutionally ordained primary authority in this field. For if Congress by what, as here, amounts to mere *ipse dixit* can set that otherwise permissible requirement partially at naught I see no reason why it could not also substitute its judgment for that of the States in other fields of their exclusive primary competence as well.

I would affirm the judgments in each of these cases.[11]

---

[11] A number of other arguments have been suggested to sustain the constitutionality of § 4 (e). These are referred to in the Court's opinion, *ante,* pp. 646–647, n. 5. Since all of such arguments are rendered superfluous by the Court's decision and none of them is considered by the majority, I deem it unnecessary to deal with them save to say that in my opinion none of those contentions provides an adequate constitutional basis for sustaining the statute.