**Floyd GOMEZ, Plaintiff,**

v.

**John L. LEWIS, Josephine Roche and Henry Schmidt, Trustees of the United Mine Workers of America Welfare and Retirement Fund, Defendants.**

**Civ. A. No. 66-776.**

United States District Court
W. D. Pennsylvania.

Nov. 18, 1968.

Walter G. Stanton, Pittsburg, Pa., for plaintiff.

Kenneth J. Yablonski, Washington, Pa., and Charles L. Widman, Washington, D. C., for defendants.

OPINION

DUMBAULD, District Judge.

John D. Rockefeller, founder of the Standard Oil Trust, won unique and lasting fame in the annals of bargaining

power by inducing railroads to accord him a rebate, not only upon his own freight traffic, but upon that of other shippers (his competitors) as well. John L. Lewis, on behalf of the United Mine Workers of America, attained similar eminence by bargaining for the payment of royalty upon the mining of coal owned by other parties. The term "royalty" had theretofore been deemed to mean a payment *to the owner* of coal or other natural resources when exploited for the market by others. The Lewis "royalty" was to be payable even by the owner himself upon the mining of his own coal, and to a non-owner.

The revenues thus generated were to be used for paying pensions to retired and disabled coal miners. Certain aspects and features of the trust fund created for this purpose were described in Lewis v. Benedict Coal Co., 361 U.S. 459, 465, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960); and Myhalyk v. Lewis, 398 Pa. 395, 402–403, 158 A.2d 305, 88 A.L.R.2d 486 (1960). The fund was legalized by Section 302(c) (5) of the Taft-Hartley Act, 29 U.S.C. § 186(c) (5) as an exception to the general prohibition in 29 U.S.C. § 186(a) against payment of money by an employer to employees. That prohibition was directed against labor union racketeering. Arroyo v. United States, 359 U.S. 419, 425–426, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959).

29 U.S.C. § 186(c) (5) requires that the payment be to a trust fund, under a written agreement providing for impartial administration, and that the fund be used "for the sole and exclusive benefit of employees [of the employers paying into the fund] and their families and dependents."

Plaintiff in the case at bar seeks to require the trustees of the fund to award him a pension. In a similar claim this Court held in Pavlovscak v. Lewis, et al., 190 F.Supp. 205, 209 (W.D.Pa.1960), aff'd 295 F.2d 39 (C.A. 3, 1961), that the question for judicial determination in this type of case is whether the denial of pension was arbitrary and capricious or constituted abuse of discretion on the part of the trustees.

It is admitted by stipulation (Par. 7) and not contested by plaintiff that the trustees of the fund "are granted broad discretionary powers with regard to the administration of the Trust Fund and with respect to questions of coverage and eligibility for Trust Fund benefits and all such related matters, including the discretionary power to adopt regulations for the extension of Trust Fund benefits, the power to change those regulations from time to time, and the power to interpret the regulations so adopted to determine who meets them and who does not."

This Court in Powell v. Lewis, Civil No. 18279, C.C.H. Labor Cases, Par. 16,-866, so held. Judge Willson there upheld the reasonableness of eligibility requirements there involved, including the requirement of regular employment in a classified job (i. e. one covered by the industry's collective bargaining agreement) in the coal industry immediately preceding May 29, 1946, when the first trust came into existence.

This requirement, among others, precludes plaintiff from being eligible for a pension in the case at bar. It is stipulated that between September 1944 and October 1957 he was a partner in Dorg Mining Company, and thus an employer rather than an employee on May 29, 1946.

Plaintiff was similarly ineligible by reason of failure to meet the requirement of twenty years of classified service within the thirty years immediately preceding the application for pension.

Plaintiff's application was filed on April 25, 1963. The thirty year period would thus begin April 25, 1933. Defendants gave plaintiff credit for the years 1934–44, one-fourth of 1957, and 1958–62. He retired from the coal industry on June 9, 1962. He was given credit for 16¼ of the necessary 20 years. Plaintiff did not claim any credit prior to March 6, 1934. Apparently he was not connected with the coal industry in 1933, and in any event that year would

not have changed the result. However, plaintiff claimed service for the three years 1944–46 with the Harkleroad Mines as a miner loader. He was not given credit for 1945 and 1946. But these years also would not have sufficed to meet the twenty year minimum.

In defining what shall constitute a year of service, Resolution No. 56, Par. I, B, 1 (stipulation Par. 8) contains a provision reading as follows:

" * * * provided further that he was not a participant in nor in any way connected with, the operation or management of a coal mine or coal operation, and was not the recipient of income, revenue, emolument, proceeds, gift or return from the operation or management of a coal mine or coal operation either directly or indirectly."

It may well be that this proviso is too broad, if it is advanced merely for the sake of conformity with the statute and not as an exercise of prudential discretion by the trustees, and that a person who is duly qualified as an employee of an employer paying into the fund should not be disqualified merely because he owns a share of stock in a large coal company traded in on the stock exchange. However, this would not benefit plaintiff, as he claims no industry employment for the excluded years other than as a tipple man for the Dorg Mining Company, of which he was admittedly a partner during those years. Therefore he did not meet the eligibility requirements in force at the time of his application, which requirements were reasonable in so far as they applied to plaintiff.

Plaintiff's chief contention is that when the above quoted proviso regarding time spent as an operator or in management was adopted on April 11, 1960, and publicized by a letter dated June 28, 1960, and went into effect on July 1, 1960, plaintiff, who was then over the prescribed retirement age of 60 (having been born on March 14, 1898) and who allegedly would have been acceptable un-der the regulations in force prior to July 1, 1960, should have been given sufficient time to elect to retire under the old regulations before being excluded by the new regulations.

This contention is based solely upon the authority of Kosty v. Lewis, 115 U.S.App.D.C. 343, 319 F.2d 744 (D.C. App.1963), decided on May 23, 1963, rehearing denied on July 15, 1963. The *Kosty* case thus postdates not only the adoption of the 1960 regulation, but also the date of filing of plaintiff's application on April 25, 1963, and defendants' rejection of it on June 26, 1963.

Defendant contends, on the other hand, that since it is stipulated that the 1960 change was adopted in order "to comply with the terms and provisions of the Labor Management Relations Act, 1947, [29 U.S.C.A. § 186(c)] which requires benefits to be paid solely to employees of signatory or contributing employers, and other applicable law, and thus in order that no coal industry service credit would be given any individual for any period of time that he was not employed in the capacity of an employee under the National Labor Relations Act [29 U.S.C.A. § 186]", plaintiff was not entitled to any adequate notice of proposed change or any period of grace within which to elect to retire under the old rules.

We think it clear that if plaintiff was entitled to an adequate opportunity to take advantage of the existing regime before it could be changed, the two day period from June 28 to July 1 was insufficient.

But was plaintiff entitled to any notice at all?

We cannot agree with defendants that notice, if otherwise required, need not be given if the purpose of the change is to eliminate an illegal provision. This would amount to arguing that a soldier about to miss his plane for Vietnam would be entitled to exceed the speed limit when driving to the airport in order to get their on time so that he will not be unlawfully a. w. o. l.

■ It appears that before 1960 the trustees granted coal industry service credit for miners who operated for themselves a small mine. It was felt that a miner who actually did the manual labor himself, as distinguished from management activities, should not be excluded from credit for time thus spent. However, the statute speaks of "employees" of "employers" who pay into the fund, not of "coal miners". Employee status is clearly required in order to comply with the statutory exemption permitting payments into the fund.

■■ We are not holding that the trustees were necessarily wrong before 1960 and that their pre-1960 grants of pensions based upon self-employment as a coal miner were *ultra vires* and constituted a breach of trust. It is enough to say that such a position was reasonably arguable and plausible enough to justify the trustees, as a matter of prudence and expediency in administering the trust, to make the change in the practice which they adopted in 1960.

It is questionable, however, whether plaintiff would in fact have qualified for a pension under the pre-1960 practice. The Dorg company was not a one-man mine or in any sense a small operation. There were from 11 to 22 employees during the period of plaintiff's status as a partner.

This circumstance distinguishes the case at bar from *Kosty,* where nothing remained to be done except for the applicant to retire and file his application. In that case it was conceded that he had met all the other qualifications under the old rule.

Furthermore, if it were necessary, we would hold, notwithstanding our high personal esteem for the eminent author of the *Kosty* opinion, Judge McGowan, and his colleagues, that we are not bound by that decision, since plaintiff elected to sue in the Third Circuit rather than in the District of Columbia. We sympathize with the humanitarian considerations which underlie the *Kosty* ruling, but feel that in the light of the ample authority granted to the trustees of this fund they had full legal power to do what they did in the case at bar.

We cannot escape the impression that the *Kosty* court, perhaps because located in physical proximity to the nation's highest tribunal, has been inspired by humanitarian views to utilize adjudication as an instrumentality of reform,[1] to use the pithy phrase of Professor Archibald Cox, former Solicitor General of the United States. We believe that this fund is a trust, as the Pennsylvania Supreme Court held in *Myhalyk,* supra, and that the principles for resolving the pending controversy must be sought *in pari materia* with Scott on Trusts rather than in considerations of humanity and morality which might be appropriate in considering the rights of illiterate and transient voters, rioting students,[2] underprivileged school children, and welfare or relief recipients to fair and equal treatment. Cf. Charles A. Reich, "The New Property", 73 Yale L.J. (1964) 733, 740–41, 785; Katzenbach v. Morgan, 384 U.S. 641, 643–644, 647, 86

1. See John M. Harlan, "Keeping the Judicial Function in Balance", 49 Am.Bar Assn.J. (1963) 43; Reynolds v. Sims, 377 U.S. 533, 624–625, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

2. In a time of overcrowded campuses, when many young people have difficulty in being admitted to the college of their choice, it would seem that the academic authorities would be in a good position to expel *instanter,* to make room for others who would better utilize the facilities, those students who instead of getting an education seek experience as a

storm-trooper or to disrupt the functioning of educational or political processes. Yet academic institutions are hesitant and reluctant to take stringent action. Solicitor General Erwin Griswold, address to American Law Institute, May 24, 1968. And although no Supreme Court case as yet has compelled Columbia University to refrain from disciplinary measures against the students participating in the disturbances in the spring of 1968, *those seeking leniency may find some comfort* in the report of the investigating commission of which Professor Archibald Cox was chairman.

S.Ct. 1731, 16 L.Ed.2d 828 (1966); Carrington v. Rash, 380 U.S. 89, 93–94, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Griffin v. Prince Edward County School Board, 377 U.S. 218, 230–231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Pavlovscak*, supra, it was held immaterial that plaintiff attempted to establish that a pension was paid to another applicant in circumstances very similar to his.

Accordingly, we conclude that the trustees were authorized to amend the regulations without giving plaintiff an opportunity to apply for a pension before the new requirements took effect, under which he was admittedly ineligible.

Judgment must be rendered for the defendants.