LIPEZ, Circuit Judge,
dissenting.
The majority opinion is a carefully reasoned and narrowly drawn analysis of the Eleventh Amendment issue raised by the application in this case of the personal medical leave provision of the FMLA, 29 U.S.C. § 2612(a)(1)(D). It reflects the view that the legislative record invoked by Laro and the intervenor United States in support of that provision is an inadequate basis for the abrogation of state sovereign immunity in light of the Supreme Court decisions in Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), and Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). It notes correctly that the other circuits addressing similar cases have found the states immune from suits for damages under the FMLA. I recognize the weight of these precedents. Nevertheless, I must respectfully dissent.
In Kimel and Garrett, where the Supreme Court invalidated congressional abrogation of state sovereign immunity in the ADEA and ADA, respectively, the Court reviewed legislation requiring states to alter age and disability-related practices that, under rational basis review, would not be adjudged constitutional violations under Section 1 of the Fourteenth Amendment. State actions involving gender discrimination are subject to heightened scrutiny, not rational basis review. In applying the congruence and proportionality test to the FMLA’s prophylactic scheme, and the legislative record supporting it, we should recognize that the heightened scrutiny standard, and the Supreme Court precedent applying it to claims of gender discrimination, require *18 greater deference to congressional action addressing gender discrimination. Relat-edly, I think it is inappropriate to evaluate in isolation a personal medical leave provision that supplements the earetaking provisions of the FMLA with an important protection for women against gender discrimination in employment. I would vacate the district court decision dismissing Laro’s action for damages against the State of New Hampshire.
I.
In City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court set forth the congruence and proportionality test applicable to remedial and prophylactic measures enacted by Congress pursuant to Section 5 of the Fourteenth Amendment. The test first requires “a congruence between the means used and the ends to be achieved.” Id. at 530, 117 S.Ct. 2157. Additionally, the legislation may not be “so out of proportion to a supposed remedial or preventive object that it cannot be understood as a response to, or designed to prevent, unconstitutional behavior.” Id at 532, 117 S.Ct. 2157. As this language suggests, the congruence and proportionality test is malleable. “The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one.” Id. at 530, 117 S.Ct. 2157 (citations omitted).
The legislation at issue in Boeme, the Religious Freedom Restoration Act (RFRA), prohibited the federal, state and local governments from “ ‘substantially burdening’ a person’s exercise of religion even if the burden results from a rule of general applicability,” unless the government could demonstrate both that the burden was in furtherance of a compelling government interest and that the rule was the least restrictive means of achieving that interest. Id. at 515, 117 S.Ct. 2157. The Court found the scope of the RFRA to be so broad as to “ensure its intrusion at every level of government, displacing laws and prohibiting actions of almost every description and regardless of subject matter.” Id. at 532, 117 S.Ct. 2157. Because the RFRA was so sweeping in its impact, the court concluded that “[t]he stringent test RFRA demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved.” Id. at 533, 117 S.Ct. 2157.
In Kimel, where age discrimination was the basis for Congressional abrogation of state sovereign immunity, the Supreme Court found a lack of congruence because “the substantive requirements the ADEA imposes on the state and local governments are disproportionate to any unconstitutional conduct that conceivably could be targeted by the Act.” 528 U.S. at 83, 120 S.Ct. 631. Similarly, in Garrett, where disability was the basis for abrogation, the Court concluded that “[e]ven were it possible to squeeze out of these examples [from the legislative record] a pattern of unconstitutional discrimination by the States, the rights and remedies created by the ADA against the States would raise the same sort of concerns as to congruence and proportionality as were found in City of Boeme.” 121 S.Ct. at 966.
In cases involving age and disability, “the exercise of congressional Section 5 power must be congruent and proportional to behavior that a court would hold unconstitutional under rational basis review.” Robert C. Post & Reva B. Siegel, Equal Protection by Law: Federal Antidiscrimi-nation Legislation After Morrison and Kimel, 110 Yale L.J. 441, 461 (2000). However, as the Court made clear in Ki- *19 mel, the judicial inquiry in these state immunity cases does not end with a judgment on the congruence of the legislation:
That the ADEA prohibits very little conduct likely to be held unconstitutional, while significant, does not alone provide the answer to our § 5 inquiry. Difficult and intractable problems often require powerful remedies, and we have never held that § 5 precludes Congress from enacting reasonably prophylactic legislation. Our task is to determine whether the ADEA is in fact just such an appropriate remedy or, instead, merely an attempt to substantively redefine the States’ legal obligations with respect to age discrimination. One means by which we have made such a determination in the past is by examining the legislative record containing the reasons for Congress’ action.
Kimel, 528 U.S. at 88,120 S.Ct. 631.
In Kimel and again in Garrett, the Court found the legislative record inadequate. Regarding the ADEA, the Court ruled that “Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation. The evidence compiled by petitioners to demonstrate such attention by Congress to age discrimination by the States falls well short of the mark.” Ki-mel, 528 U.S. at 89, 120 S.Ct. 631. In Gairett, “[t]he legislative record of the ADA ... simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled.” 121 S.Ct. at 965. The Court noted further that: “Under rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State’s decision to act on the basis of those differences does not give rise to a constitutional violation.” Id. at 963 (quotations omitted).
II.
The Supreme Court has not yet applied the congruence and proportionality test to a legislative record supporting prophylactic measures aimed at gender discrimination. In Kimel, the Court noted an important difference between age classifications and gender classifications:
Age classifications, unlike governmental conduct based on race or gender, cannot be characterized as “so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy.” Older persons, again, unlike those who suffer discrimination on the basis of race or gender, have not been subjected to a “history of purposeful unequal treatment.”
528 U.S. at 83, 120 S.Ct. 631 (citations omitted) (emphasis added). When gender classifications are being considered, rational basis review gives way to heightened scrutiny, whereby legislation involving “classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.” Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); see also Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).
The application of heightened scrutiny to governmental classifications based on gender has important implications for the application of the congruence and proportionality test to prophylactic legislation enacted pursuant to Section 5 of the Fourteenth Amendment. The universe of constitutional governmental conduct based on age and disability is large, given the applicability of rational basis review. The *20 universe of constitutional governmental conduct based on gender is small, given the applicability of heightened scrutiny. Therefore, “heightened scrutiny creates more room for Congress to act under Section 5 because the universe of potential unconstitutional actions by the states is much larger.” Brian Ray, Note, “Out the Window”? Prospects for the EPA and the FLA after Kimel v. Florida Board of Regents, 61 Ohio St. L.J. 1755, 1783 (2000). Put another way, legislation designed to prevent gender discrimination presumptively captures a wider range of unconstitutional conduct than legislation aimed at age or disability discrimination. In this sense, gender-protective legislation has a better chance of passing muster as “reasonably prophylactic.” Importantly, the Supreme Court has stated emphatically that it has “never held that § 5 precludes Congress from enacting reasonably prophylactic legislation.” Kimel, 528 U.S. at 88, 120 S.Ct. 631. In my view, the personal medical leave provision of the FMLA is reasonably prophylactic in the sense that it is an important component of a legislative scheme designed, in part, to prevent gender discrimination against women by employers, including state employers.
III.
The FMLA leave provisions entitle an eligible employee to twelve weeks of unpaid leave during any twelve-month period for one or more of the following:
(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter; (B) Because of the placement of a son or daughter with the employee for adoption or foster care; (C) In order to care for the spouse, or a son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition; (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.
29 U.S.C. § 2612(a)(1) (2001).
Provisions (A), (B) and (C) in this scheme all involve unpaid leave for the purpose of caring for another family member. Only provision (D) provides unpaid leave because of the personal medical condition of the employee. Some history emphasizes why leave programs limited to the need of an employee to care for another family member can disadvantage women.
Before 1978 there was no federally required parity in the allowance for pregnancy and sick leave, a circumstance which prevented many women from entering and advancing in the workforce altogether. Even if sick leave were available, pregnancy was often excluded from this benefit, making the policy one that favored men and left women who wanted to have children out of a job. The Pregnancy Discrimination Act (PDA), 92 Stat. 2076 (1978), sought to rectify this inequity by affording some entitlement to pregnancy-related leave. Employers who provided sick leave for other conditions were required to offer the same level of benefits for maternity leave. 42 U.S.C. § 2000e(k). While this change surely gave women some increased opportunity to enter the workplace, it left unaddressed the presumption that women of child-bearing age would take more leave and were thus less desirable employees in the first place. As a result, “employers might find it cost-effective to discriminate against married women of child-bearing age, since these women would end up costing a firm more than they contribute to its worth.” S.Rep. No. 102-68, at 73 (1991) (testimony of economist Deborah Walker). The protections that the PDA was intended to pro *21 vide ultimately had some negative impact on women’s workplace opportunities.
Against this background, Congress enacted an FMLA scheme which included the personal medical leave provision. The Act states: “Congress finds that ... employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender.” 29 U.S.C. § 2601(a)(6). The Act seeks to achieve its purposes “in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis ... [and] to promote the goal of equal employment opportunity for women and men.” 29 U.S.C. §§ 2601(b)(4) & (5).
In reports preceding enactment of the FMLA, there was close attention to the need for a personal medical leave provision in the FMLA. The Senate Committee on Labor and Human Resources reported:
[A] significant benefit of the temporary medical leave provided by the legislation is the form of protection it offers women workers who bear children. Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy related disability. Legislation solely protecting pregnant women gives employers an economic incentive to discriminate against women in hiring policies; legislation helping all workers equally does not have this effect.
S.Rep. No. 102-68, at 35 (1991).
The House Committee on Education and Labor made the same point in its report on the legislation:
The FMLA addresses the basic leave needs of all employees. It covers not only women of childbearing age, but all employees, young and old, male and female, who suffer from a serious health condition, or who have a family member with such a condition. A law providing special protection to women or any defined group, in addition to being inequitable, runs the risk of causing discriminatory treatment. [This legislation], by addressing the needs of all workers, avoids such a risk.
H.R.Rep. No. 103-8, pt. 1, at 29 (1993).[1]
If Congress had drawn a line at leave for caring for other family members, there is greater likelihood that the FMLA would have been perceived as further reason to avoid granting employment opportunities to women. Heretofore, women have provided most of the child and elder care, and legislation that focused on these duties could have had a deleterious impact because of the prevalent notion that women take more advantage of such leave policies. The inclusion of personal medical leave in the scheme, unrelated to any need to care for another person, undermines the assumption that women are the only ones taking leave because men, presumably, are as likely as women to get sick. To be sure, the caretaking provisions of the Act, prongs (A) through (C), protect men and *22 women from gender discrimination by giving men the opportunity to assume equal responsibilities for the care of their families and by shielding women from the stereotype that assigns such roles to women. These provisions serve important goals independently of prong (D), the personal medical leave provision. For the reason stated, however, the inclusion of the personal medical leave provision in the FMLA is also particularly important to women in protecting them against gender discrimination.
Interestingly, there is some early evidence that the FMLA is working as the drafters had hoped. Under the FMLA, 41.8 percent of all leave-takers are men, with men invoking the FMLA for parental leave purposes in comparable numbers to women. Commission on Family and Medical Leave, A Workable Balance: Report to Congress on Family and Medical Leave Policies 75 (1996). A study of both private and public sector employers following FMLA implementation found that “differences in usage rates by industry were not related to the percent of the workforce that was female.... [E]arly indications are that both genders are making use of the Act.” Holly B. Tompson and Jon M. Werner, The Family and Medical Leave Act: Assessing the Costs and Benefits of Use, 1 Employee Rts. & Employment Pol’y J. 125, 147 (1997). It is possible, if not probable, that the inclusion of the personal medical leave provision has helped account for the increase in men such as Stephen Laro accessing leave.
The history that led to the inclusion of the personal medical leave provision in the FMLA, and the evidence of its effectiveness, highlight the congruence between this prophylactic measure and potentially discriminatory conduct by state employers. Under the lens of heightened scrutiny, such employers would be acting unconstitutionally if they denied women equal employment opportunities because of stereotypical views that women are the primary caregivers, and hence the greater employment risks. The FMLA attempts to blunt the force of such stereotypes and such discriminatory conduct by increasing the odds that men and women will invoke leave provisions in equal numbers. Unlike the ADEA provision under review in Ki-mel, which “prohibited] very little conduct likely to be held unconstitutional,” Kimel, 528 U.S. at 88, 120 S.Ct. 631, the personal medical leave provision of the FMLA attempts to prevent conduct by a state employer that would be unconstitutional. Although this congruence does not dispense with the need for Congress to justify its invocation of Section 5 of the Fourteenth Amendment to abrogate the immunity of the states, this congruence does mean that the burden of justification should be less than that applied by the Court in Kimel and Garrett.
IV.
The legislative record includes substantial material drawn from the private sector about the need for the FMLA generally, and the need for a personal medical leave provision specifically. Indeed, the legislative record is replete with evidence from the private sector that because women generally had greater access to maternity and parental leave, some employers were reluctant to hire them. See Samuel Issa-charoff & Elyse Rosenblum, Women and the Workplace: Accommodating the Demands of Pregnancy, 94 Colum. L.Rev. 2154, 2196 (1994) (quoting testimony from the United States Chamber of Commerce explaining: “Faced with mandated parental leave, a business owner choosing between two qualified candidates — one male and one female — would be tempted to se *23 lect the male.”)-[2] One hearing statement from 1987 concluded: “The lack of uniform parental and medical leave policies in the work place has created an environment where discrimination is rampant.” The Parental and Medical Leave Act of 1987, Heatings before the Subcomm. of the Senate Comm, on Labor and Human Resources, Part 2, 100th Cong. 536 (1987) (comments of Peggy Montes, Mayor’s Commission on Women’s Affairs, City of Chicago) [hereinafter Hearings on Leave Act of1987}.
There was evidence before Congress that some of this discrimination is caused by stereotypes about women which assume that women “are mothers first, and workers second,” Parental and Medical Leave Act of 1986, Joint Heatings before the Subcomm. on Labor-Management Relationship and the Subcomm. on Labor Standards for the Comm, on Education and Labor, 99th Cong. 25 (1996) [hereinafter Heatings: Leave Act of 1986 ], and that women are untrustworthy workers because of their tendency to “become pregnant and leave the labor market,” id. at 42 n. 48. The legislative record memorializes Congress’s understanding that the provisions of the FMLA would serve to rectify some of this gender discrimination. For example, one of the Senate reports stated: “Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy related disability.” S.Rep. No. 102-68, at 35 (1991). The inclusion of the personal medical leave provision in the FMLA would deter employers from acting on the assumption that women are much more likely to invoke leave provisions related only to childcare or care of seriously ill family members.
Congress also had reason to conclude that gender discrimination caused by differing leave policies was a significant problem in state employment as well as in the private sector. As the House report noted: “Private sector practices and government policies have failed to adequately respond to recent economic and social changes that have intensified the tensions between work and family.” H.R.Rep. No. 103-8, pt. 1, at 21 (1993). During the hearings in 1986, Congress heard testimony that “[pjublic sector leaves don’t vary very much from private sector leaves.” Hearings: Leave Act of 1986, at 30; see also id. at 147 (noting that “discriminatory treatment” occurs in both the public and private sectors). Data showed that, like private employers, many states made different allowances for leave between male and female employees, reflecting a similarity in employment practices and leave policies across sectors. See Hearings on Leave Act of 1987 at 364-75; Family and Medical Leave Act of 1989: Heatings on H.R. 770 Before the Subcomm. on Labor-Management Relations, 101st Cong. 271 (1989). Indeed, the legislative record describes state provisions prescribing inequitable access to leave depending upon gender. See H.R.Rep. No. 103-8, pt. 1, at Attachment B (1993). These policies raised legitimate concerns that discriminatory presumptions about women’s leave-taking practices could influence private *24 and public hiring decisions, including those by state employers.
V.
In my view, this legislative record justifies Congress’s abrogation of state immunity in the FMLA pursuant to its Section 5 authority. Although Kimel and Gamtt reject the notion that Congress may infer discrimination by the states from findings of private-sector discrimination, that rejection does not necessarily apply in a case such as this. Neither Kimel nor Gamtt involved legislation designed to remedy discrimination against a class of persons who receive heightened scrutiny under the Equal Protection Clause. Against a backdrop of extensive evidence of employment discrimination in the private sector based on leave policies, the more limited evidence of similar practices by state government serves to confirm the logical inference that state employment practices are similar to private sector practices. As the dissent observed in Kazmier v. Widmann, 225 F.3d 519 (5th Cir.2000):
[Ejvidence of private discrimination based on age has no probative value with respect to unconstitutional discrimination based on age by the States because it is so unlikely that the discrimination engaged in by private employers would be considered unconstitutional if engaged in by the States. With respect to race and gender, however, because of the significant likelihood that any discrimination by the States on those bases would be unconstitutional, evidence that such discrimination is widespread through the private sector may be sufficient.
Id. at 548 n. 15 (Dennis, J., dissenting).
The Court has also upheld laws that can be deemed “reasonably prophylactic,” Ki-mel, 528 U.S. at 88, 120 S.Ct. 631, even without explicit evidence of unconstitutional discrimination. See Katzenbach v. Morgan, 384 U.S. 641, 653-55, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (holding that Congress may legislate to enforce the Equal Protection clause even if the law’s scope extends beyond the unconstitutional behavior sought to be prevented). Otherwise, Congress would be confined to the “insignificant role” of abrogating state authority only when the judicial branch is prepared to adjudge an action unconstitutional. Id. at 648-49, 86 S.Ct. 1717; see also Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (“When Congress acts pursuant to § 5, [] it [is] exercising legislative authority that is plenary within the terms of the constitutional grant.”).
While it is true that the FMLA goes beyond disallowing discrimination based on gender and imposes affirmative duties on the states in furtherance of equal protection, that imposition is permissible pursuant to Section 5’s enforcement authority. See, e.g., Morgan, 384 U.S. at 658, 86 S.Ct. 1717 (upholding legislation designed to cure discrimination based on ethnicity). Unlike the RFRA at issue in Boeme, the FMLA does not represent “[s]weeping coverage [that] ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter.” Boerne, 521 U.S. at 532, 117 S.Ct. 2157. Rather, the Act’s requirements are confined to particular terms of employment benefit plans; the impact of the Act’s requirements is more predictable and limited.
In United States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), -the Supreme Court stated: “ ‘Inherent differences’ between men and women, we have come to appreciate, remain cause for celebration, but not for the denigration of the members of either sex or for *25 the artificial constraints on an individual’s opportunity.” Id. at 533, 116 S.Ct. 2264. Misguided views about inherent differences between men and women have the alarming potential to “create or perpetuate the legal, social and economic inferiority of women.” Id. at 534, 116 S.Ct. 2264. This truth underscores the importance of employment leave policies that inhibit gender-based stereotyping and unconstitutional discrimination by state employers. Given the substantial record of gender discrimination in the private sector, some evidence of similar discrimination by the states, and the teachings of history and logic, I conclude that Congress properly exercised its Section 5 authority in abrogating the states’ Eleventh Amendment immunity in the FMLA. The district court decision barring Laro’s suit for damages against the State of New Hampshire should be vacated.

. The article also cites poll figures that show employers admitting a tendency not to hire young women in the face of leave legislation. Id. at 2196 n. 169 (citing 139 Cong. Rec. H368 (daily ed. Feb. 3, 1993) (statement of Rep. Dreier) and 137 Cong. Rec. H9748 (daily ed. Nov. 13, 1991) (statement of Rep. DeLay)). While this data was used to counter arguments in favor of the FMLA, it is not logically consistent to conclude that leveling leave policies across genders would make the circumstance of women more grave.