SULLIVAN et al., Appellants,

v.

HAMILTON COUNTY BOARD OF HEALTH et al., Appellees.

[Cite as *Sullivan v. Hamilton Cty. Bd. of Health,* 155 Ohio App.3d 609, 2003-Ohio-6916.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020308.

Decided Dec. 19, 2003.

610

Taft Stettinius & Hollister L.L.P. and Timothy K. Sullivan, for appellants.

Michael K. Allen, Hamilton County Prosecuting Attorney, and Nee Fong Chin, Chief Assistant Prosecuting Attorney, for appellees.

Jim Petro, Attorney General, Thomas P. Behlen and Sherry L. Mowry, Assistant Attorneys General, for amicus curiae Ohio Attorney General.

SUNDERMANN, Judge.

{¶ 1} Plaintiffs-appellants Wendall and Marilyn Sullivan appeal from the judgment of the Hamilton County Court of Common Pleas upholding a decision of defendant-appellee Hamilton County Board of Health ("board") that denied the Sullivans' request for a variance from provisions of the Hamilton County Household Sewage Code Regulations. For the reasons that follow, we affirm the judgment of the trial court.

## I. Facts

{¶ 2} The Sullivans own property at 7818 Hopper Road, which is located within the jurisdiction of defendant-appellee Hamilton County General Health District ("health district"). The property, which includes approximately 11.5 acres and a small house, was purchased in 1972 as an investment for the Sullivan's retirement. Since 1972, the area surrounding the Sullivans' property has been substantially developed with the addition of approximately 62 new homes. Currently, there are public sanitary-sewer systems in the area, but household sewage-disposal systems are also utilized.

{¶ 3} The residential properties surrounding 7818 Hopper Road employ various types of household sewage-disposal systems. Approximately one-third of the properties discharge their effluent into a creek that runs through the Sullivans' property.[1] The household sewage-disposal systems on these properties were installed between 1975 and 1982, which was prior to the adoption of Household Sewage Code Regulation 529 on December 13, 1993.

{¶ 4} In 2000, the Sullivans contacted a real estate developer to discuss the sale of their property. The developer told the Sullivans that it would offer them

---

1. Because these household sewage systems discharge the treated effluent to the surface of the ground or to a body of water, the systems are known as "discharging systems." These systems differ from systems that absorb all of the effluent in the ground and are commonly known as "absorption systems."

$1,250,000 if ten homes with discharging systems could be built on their property. The developer subsequently submitted a proposed plan for the development to the health district for review. A registered sanitarian for the health district visited the property and informed the developer by letter that the proposed development would not be approved because it did not comply with the Ohio Sanitary Code and Household Sewage Code Regulation 529. Sometime thereafter, the sanitarian met with the developer to discuss other sewage options for the development.

{¶ 5} In March 2001, Mr. Sullivan met with Tim Ingram, the Hamilton County Health Commissioner, and Rob Caudill, the Director of Water Quality for the health board, to discuss the development of his property. Mr. Sullivan stated that in order for him to receive $1,250,000 for the property, the developer needed to develop ten lots on the property. Mr. Sullivan further stated that this could be accomplished only by using off-lot discharging systems. Ingram informed Mr. Sullivan that Household Sewage Code Regulation 529.03(K) barred the use of any discharging household sewage-disposal system on any parcel of real estate newly created after March 8, 1999, but that he could potentially develop four to six lots utilizing soil-absorption systems without running afoul of Regulation 529. Mr. Sullivan stated that if these onsite absorption systems were used, the developer would pay him only $650,000 for his property. Ingram and Caudill told Mr. Sullivan that if he wished to proceed with the development as he had proposed, he could file an application for a variance under Section 529.19 of the Sewage Code.

{¶ 6} In April 2001, the Sullivans filed an application for approval of a new subdivision. The proposed plan called for the creation of ten lots. As proposed, the subdivision would use discharging household sewage-disposal systems for seven lots, with one of the lots having a system discharging to an undefined roadside drainage system, and the other six lots discharging to a creek on the Sullivans' property. The two remaining lots would use on-lot household sewage-disposal systems but would not have space available for replacement systems when the original systems failed. The Sullivans' home, which utilized a discharging system, would be the tenth home in the proposed subdivision. Because the proposed subdivision plan did not comply with the Ohio Sanitary Code and Household Sewage Code Regulation 529, the Sullivans sought a variance pursuant to Section 529.19. The Sullivans stated that they were seeking the variance because all of the properties in the surrounding area had been developed with septic systems that flowed into a creek on their property.

{¶ 7} The board assigned a registered sanitarian employed by the health district to investigate and to provide an initial response to the Sullivans' variance application. The sanitarian noted that the proposed development did not comply

with the following sections of the local sewage code: 529.03(K),[2] 529.04(C)–(5),[3] 529.12,[4] and Table 1.[5] The sanitarian recommended that the variance be denied. In his report, the sanitarian stated that onsite household sewage-disposal systems could not be designed for the subdivision as proposed and that the fourth lot in the subdivision had no room for an onsite system due to the size and topography of the lot. The sanitarian also noted that approval of the proposed subdivision would add seven more discharging systems to the creek running through the Sullivans' property, which already had 26 systems discharging into it. The sanitarian stated that the Sullivans could still develop their property in conformance with the local sewage code if they created four new parcels with on-lot household sewage-disposal systems that utilized soil absorption. Caudill agreed with the sanitarian's recommendation but provided no analysis or comment.

{¶ 8} The board scheduled a hearing on the Sullivans' variance request for May 14, 2001. At the Sullivans' request, the board rescheduled the hearing to June 11, 2001. At the June 11, 2001 hearing, the Sullivans presented the board with a packet of materials, including their evidence and legal arguments. The board tabled the variance request so that it could review the information the Sullivans had provided and so that the Sullivans could obtain additional information about the prospect of extending public sanitary sewers to their property.

{¶ 9} At the next board meeting on July 9, 2001, Mr. Sullivan asked that his variance be tabled until the August meeting so that he could look into the four sewage options proposed by the Metropolitan Sewer District for the subdivision. At a meeting on August 13, 2001, the Sullivans presented the board with four cost estimates for adding sewers to the subdivision, which ranged from $596,000 to $678,250. The Sullivans told the board that adding sewers was not an option because of the cost involved. At that time, the Sullivans presented the board with another packet of information. The board again tabled the variance request

---

2. Section 529.03(K) provides that "[n]o new parcel shall be allowed to be created when site conditions will require use of a household sewage disposal system that necessitates discharge of effluent to the surface of the ground."

3. This section provides that "[t]he sanitation site plan for a household sewage disposal system intended to serve a dwelling or other building for which no approved system has been installed shall show: Area for sewage replacement."

4. Section 529.12(D) provides that a defined drainage way is "a natural concavity in the landscape which exhibits an eroded channel with sufficient width and depths so that upon finish grading of the adjacent area the channel cannot be crossed with a hand mower, and which character is continuous to the point of discharge into a larger drainage feature."

5. Table I provides the location of various elements of on-site sewage-disposal systems in relation to certain structures and boundaries.

so that the board and its legal counsel could review the information and legal arguments submitted by the Sullivans.

{¶ 10} On September 10, 2001, the board asked the Sullivans to contact the Ohio Environmental Protection Agency ("OEPA") to obtain information on sanitary sewers and again tabled the variance hearing. On October 8, 2001, the board discussed the Sullivans' variance request and a September letter from the OEPA. In its letter, the OEPA stated that it would not object to the use of onsite sewage-disposal systems on lots that were three acres or greater. The board, after reviewing information from the health district, the Hamilton County Metropolitan Sewer District, and the OEPA, all of which indicated that the Sullivans could develop their property without utilizing discharging systems, denied the Sullivans' request for a variance. On October 9, 2001, the health commissioner informed the Sullivans of the board's decision by letter.

{¶ 11} Shortly thereafter, the Sullivans appealed from the board's decision to the trial court pursuant to R.C. 2506.03, and the trial court permitted the parties to submit additional evidence.[6] The trial court affirmed the board's decision, ruling that the evidence presented supported the board's denial of the Sullivans' request for a variance. The trial court also rejected the Sullivans' arguments that Section 529.03(K) was unconstitutional.

## II. Analysis

{¶ 12} In a sole assignment of error, the Sullivans now contend that the trial court's decision must be reversed because the board's decision was not supported by a preponderance of reliable, probative, and substantial evidence, and because Section 529.03(K) is unconstitutional. The Sullivans raise four separate issues for review under this assignment of error: (1) the trial court committed reversible error when it affirmed the board's decision to deny the variance; (2) Section 529.03(K) of the local sewage code is unlawful and unenforceable because it conflicts with the Ohio Sanitary Code and exceeds the board's authority thereunder; (3) the trial court's enforcement of Section 529.03(K) has resulted in an unlawful taking of the Sullivans' property; and (4) Section 529.03 discriminates irrationally against owners of land developed after March 8, 1999, in violation of the equal-protection guarantees in the United States and Ohio Constitutions.

---

6. Because there was no transcript of the hearing before the board, the board and the health district moved to supplement the record pursuant to R.C. 2506.03(A)(3). In an agreed entry, the board supplemented the record with an affidavit from Robert Caudill. In his affidavit, Caudill averred that the documents attached to his affidavit were true and accurate records from the Hamilton County Health District regarding inspections of the household sewage-disposal systems for 7818 Hopper Road and the surrounding properties.

## A. Standard of Review

{¶ 13} Before addressing the Sullivans' arguments, we must determine the extent of our review under R.C. 2506.04. In an administrative appeal filed pursuant to R.C. 2506.04, the common pleas court must weigh the evidence in the record and determine whether the administrative order is " 'unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record.' " [7] In this review process, the common pleas court may consider new or additional evidence. [8] In contrast, an appellate court has a more limited role and must affirm, unless it finds, "as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative, and substantial evidence." [9] With this limited standard of review in mind, we now address the Sullivans' arguments.

## B. Issues

**1. The trial court's decision denying the variance was supported by a preponderance of reliable, probative, and substantial evidence.**

{¶ 14} In their first issue, the Sullivans argue that the trial court's approval of the board's decision denying them a variance was unlawful, unreasonable, capricious, and an abuse of discretion because the board refused to comply with the provisions for granting a variance. The Sullivans further contend that had the board performed its duty under Section 529.19 to determine whether the variance would have defeated the spirit and general intent of the codes, it would have granted their request for a variance.

{¶ 15} Section 529.19 of the Sewage Code mirrors the standard in the Ohio Sanitary Code for granting a variance with respect to household sewage-disposal systems. Section 529.19 provides that "the Board of Health may grant the variance provided such variance will not defeat the spirit and general intent of the rules contained in Chapter 3701–29 of the Ohio Administrative Code and/or Regulation 529." Similarly, Ohio Adm.Code 3701–29–20(A) provides the following:

{¶ 16} "The board of health may grant a variance from the requirements of rules 3701–29–01 to 3701–29–21 of the Ohio Sanitary Code as will not be contrary to the public interest, where a person shows that because of practical difficulties

---

7. *Smith v. Granville Twp. Bd. of Trustees* (1998), 81 Ohio St.3d 608, 612–613, 693 N.E.2d 219, quoting R.C. 2506.04.

8. Id.

9. *Kisil v. Sandusky* (1984), 12 Ohio St.3d 30, 34, 12 OBR 26, 465 N.E.2d 848.

or other special conditions their strict application will cause unusual and unnecessary hardship. However, no variance shall be granted that will defeat the spirit and general intent of said rules, or be otherwise contrary to the public interest."

{¶ 17} As the parties requesting the variance, the burden was upon the Sullivans, not the board, to demonstrate (1) that the strict application of Regulation 529 would cause them to encounter "practical difficulties" or an "unusual or unnecessary hardship," and (2) that granting the variance would not defeat the spirit and general intent of the rules or be otherwise contrary to the public interest.[10]

{¶ 18} The trial court ruled that the board had properly denied the Sullivans' variance request because granting the variance would have defeated the spirit and general intent of the sanitary code and local regulations and would have been contrary to the public interest. The trial court further reasoned that the element of unusual or unnecessary hardship did not seemingly "come into play" given the strong public interest in favor of denying the variance. The trial court, nonetheless, concluded that the board's determination that the Sullivans could still develop four new parcels showed that the board had weighed the impact of denying the variance and had concluded that the denial of the variance did not rise to the level of unnecessary hardship.

{¶ 19} The Sullivans contend that the trial court erred in affirming the board's decision when they had proved that they faced "practical difficulties" or "other special conditions" that made it necessary to use discharging systems that would otherwise be proscribed by Section 529.03(K) of the local sewage code. The Sullivans present three arguments to support this assertion. First, they contend that because the board's own sanitarian determined that onsite systems could not be designed for the subdivision as it was proposed, they demonstrated that the strict application of Section 529.03(K) would cause them unusual or unnecessary hardship. Second, they argue that because the strict application of Section 529.03(K) would allow them to develop only four parcels when the zoning law permitted them to subdivide their property into as many as 20 separate parcels, they demonstrated unnecessary hardship. Finally, they contend that because the vast majority of new homes that had been developed around their property all used discharging systems, they demonstrated that the strict application of Section 529.03(K) would cause them "unusual and unnecessary hardship." We disagree.

---

10. See, e.g., *C. Miller Chevrolet, Inc. v. Willoughby Hills* (1974), 38 Ohio St.2d 298, 302, 67 O.O.2d 358, 313 N.E.2d 400; *Gibraltar Mausoleum Corp. v. Cincinnati* (1981), 1 Ohio App.3d 107, 111, 1 OBR 410, 439 N.E.2d 922, fn. 1.

{¶ 20} The Ohio Supreme Court has stated that "[t]he mere fact that [a landowner's] property can be put to a more profitable use does not, in itself, establish an unnecessary hardship where less profitable alternatives are available within the zoning classification."[11] Here, the board found that the Hamilton County Metropolitan Sewer District had given the Sullivans four viable options to provide sewers for the proposed subdivision and had alternatively stated that onsite systems could be installed if more acreage was included in each lot. Thus, less profitable alternatives existed for developing the subdivision. Furthermore, the fact that homes near the Sullivans' property were permitted to use discharging systems was of no consequence, given that these homes were constructed prior to the adoption of the code and prior to the board's recognition that the discharging systems were creating health problems.

{¶ 21} The Sullivans next contend that they offered the board evidence that granting the variance would not be contrary to the public interest. They argue that granting the variance would not have contravened the public interest because their proposed discharging systems complied fully with all current state and local standards, including standards for the quality of the discharged effluent. But the only proof before the board was a facsimile transmittal cover sheet from Bio–Microbics Incorporated, which stated the following: "Technically, our system can meet these regulations if you add disinfectant on afterwards. I think there is a tendency to get away from the use of surface discharge in Ohio." In our view, this was not sufficient to show that the proposed discharging systems complied with state and local standards.

{¶ 22} The Sullivans next contend that because the board's records showed that properly monitored discharging systems were not only operating in Hamilton County but were permissible under three separate sections of the local sewage code, they demonstrated that their variance request would not be contrary to the public interest. While we agree that there was some evidence in the record that the board's inspection and monitoring of discharging systems had resulted in decreasing the immediate health risks posed by these systems countywide, there was also evidence through numerous surveys and studies that existing discharging systems were still failing and creating health nuisances. According to one of these reports, the Hamilton County Health Department, since November 15, 1993, had inspected a total of 2,104 home-aeration systems, and 963 or 45.8 percent of these systems were found to be failing. The health department estimated that up to 25,000 home-aeration systems existed in Hamil-

11. *Consolidated Mgt., Inc. v. Cleveland* (1983), 6 Ohio St.3d 238, 242, 6 OBR 307, 452 N.E.2d 1287.

ton County.  This resulted in about 11,450 failing systems countywide, the equivalent of about two million gallons per day of raw sewage being discharged.

{¶ 23} Furthermore, the Sullivans' argument ignores evidence concerning the board's inspection and monitoring of existing household sewage-disposal systems in its jurisdiction.  Inspection data by the board revealed that only six of the 24 household sewage-disposal systems that discharged their effluent into the stream flowing through the Sullivans' property had no problems over an eight-year period.  The board also had evidence that the particular soil conditions on the Sullivans' property were more conducive to the failure of these types of systems.  This was corroborated by the fact that the discharging system for the Sullivans' residence had failed six times in the eight-year inspection period.  Furthermore, there was evidence that the creek running through the Sullivans' property would have been unable to handle the additional discharge that the proposed systems would have created.  Additionally, there was evidence that the proposed subdivision of the Sullivans' property into ten lots would have precluded replacement of the household sewage-disposal systems on particular lots should the systems on those lots have failed.  The trial court stated that, had the board granted a variance in this situation, it would have "in essence [been] creating a time bomb for future homeowners."  Given this evidence, we cannot say that the trial court erred when it found that the board had properly denied the Sullivans' variance request as contrary to the public interest.  Because the trial court was entitled to conclude that the board's decision to deny the Sullivans' request for a variance was supported by a preponderance of substantial, reliable, and probative evidence, we cannot say the trial court erred in affirming the board's decision.

**2.   Section 529.03(K) was within the board's authority to enact.**

{¶ 24} In their second issue, the Sullivans contend that Section 529.03(K) is unlawful and unenforceable because it conflicts with the Ohio Revised Code and the Ohio Sanitary Code, and because it exceeds the board's authority thereunder.

{¶ 25} Ohio courts have long recognized that the protection and preservation of the public health is a prime governmental concern and, thus, a function of the state.[12]  "It is equally well established that the state can directly exercise its police power concerning the public health or it may delegate that power to other governmental agencies."[13]  But "* * * an administrative agency has only such regulatory power as is [expressly or impliedly] delegated to it by the General

---

12.  See *Delaware Cty. Bd. of Commrs. v. Columbus* (1986), 26 Ohio St.3d 179, 182, 26 OBR 154, 497 N.E.2d 1112; *DeMoise v. Dowell* (1984), 10 Ohio St.3d 92, 93–94, 10 OBR 421, 461 N.E.2d 1286.

13.  *DeMoise,* supra, 10 Ohio St.3d at 93–94, 10 OBR 421, 461 N.E.2d 1286, citing *Ex parte Company* (1922), 106 Ohio St. 50, 139 N.E. 204.

Assembly. Authority that is conferred by the General Assembly cannot be extended by the administrative agency."[14] Furthermore, administrative rules may not formulate public policy, but rather are limited to developing and administering policy already established by the General Assembly.[15]

{¶ 26} R.C. 3701.34 provides that the public health council, acting on behalf of the Ohio Department of Health, has the power to promulgate sanitary regulations of general application throughout the state, and that such regulations shall be known as the sanitary code. Pursuant to this statutory authority, the public health council adopted the Ohio Sanitary Code, which is set forth in Ohio Adm.Code 3701–29–01 through 3701–29–21. R.C. 3701.56 commands local boards of health to enforce the "sanitary rules and regulations adopted by the department of health."

{¶ 27} Section 3701–29–03(A) of the Ohio Sanitary Code provides that before one may subdivide property, one must submit plans to the health district that clearly show "that the provisions of rules 3701–29–01 to 3701–29–21 of the Ohio Sanitary Code can be adequately met." Section 3701–29–03(B) further provides, "No person shall install household sewage disposal systems in new subdivisions, unless it is considered to be impracticable or inadvisable by the board of health and the Ohio environmental protection agency to install a central sewage system."

{¶ 28} Section 3701–29–02 of the Ohio Sanitary Code sets forth the requirements for household sewage-disposal systems. Under this section, the design, construction, installation, location, maintenance, and operation of household sewage-disposal systems must comply with the rules and engineering practices acceptable to the Ohio Department of Health and current Ohio Environmental Protection Agency effluent standards. Section 3701–29–02(L) provides that no household sewage-disposal system shall be installed, maintained, or operated on property accessible to a sanitary sewerage system. Section 3701–29–02(G) further provides that off-lot household sewage-disposal systems are allowed only when installation of on-lot systems is not possible and several conditions are met. Furthermore, Section 3701–29–02(M) provides that when a sanitary sewer system becomes accessible, a property owner must abandon a household sewage-disposal system and hook up to the sanitary-sewer system. Section 3701–29–20(D) further provides that "Rules 3701–29–01 to 3709–29–21 of the Ohio Sanitary Code are minimum standards" and that a "board of health may adopt more stringent standards when local conditions indicate such standards are necessary."

---

14. *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health,* 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, at ¶ 38.

15. Id. at ¶ 41.

{¶ 29} In addition to granting local boards of health the express power to enforce the Ohio Sanitary Code, the General Assembly in R.C. 3709.21 has provided that the board of health of a general health district can "make such orders and regulations as are necessary for its own government, for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances." In *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health,* the Ohio Supreme Court held that R.C. 3709.21 is not an unlimited grant of authority, but is rather a rules-enabling statute.[16] Thus, the court held that specific statutory authorization beyond that set forth in R.C. 3709.021 is required before a local board of health can regulate in a certain area.[17]

{¶ 30} The Sullivans argue that the board has no authority to prohibit discharging systems on newly created parcels. They contend that the board's role is statutorily limited instead to (1) the issuance of permits for discharging systems on terms that will prevent the systems from creating nuisances, and (2) the abatement of nuisances created by those having permits for these systems. Consequently, they maintain that the board exceeded both its regulatory authority and its statutory authority when it adopted Section 529.03(K). We disagree.

{¶ 31} The Ohio Supreme Court has held that "absent statutory language that limits local regulation, state rules providing minimum requirements do not conflict with local rules providing for stricter regulation."[18] Under the Ohio Sanitary Code, discharging systems for new subdivisions are permissible only when (1) it is impracticable or inadvisable to install a sanitary-sewerage system, (2) installation of on-site systems is not permissible, and (3) several conditions have been met. Thus, the installation and operation of discharging systems are clearly disfavored under the Ohio Sanitary Code. Furthermore, Section 3701–29–20(D) of the Ohio Sanitary Code provides that "Rules 3701–29–01 to 3709–29–21 of the Ohio Sanitary Code are minimum standards" and that a "board of health may adopt more stringent standards when local conditions indicate such standards are necessary." Based on the plain language of Section 3701–29–20(D), it is clear that the Ohio Department of Health did not want to preempt local boards of health and local health districts from regulating household sewage-disposal systems. Moreover, if we were to adopt the Sullivans' interpretation of the Ohio Sanitary Code, the word "minimum" would be rendered meaningless and the state rules would be not only minimum standards but also maximum standards.

---

16. Id. at ¶ 45.

17. Id. at ¶ 44–47.

18. *Middleburg Hts. v. Ohio Bd. of Bldg. Standards* (1992), 65 Ohio St.3d 510, 513–515, 605 N.E.2d 66.

Such an interpretation would also not account for the fact that local boards of health need some flexibility "to meet unforeseen public-health concerns and to promptly address any problems arising from previous orders and regulations. Moreover, local boards need the freedom to abate health hazards that are unique to their specific locations." [19]

{¶ 32} Nor can we say that the board exceeded its statutory authority in adopting Section 529.03(K). R.C. 3709.21 provides that the board of health of a general health district can "make such orders and regulations as are necessary for its own government, for the public health, the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances." Here, the board's regulation was limited to developing and administering policy already established by the General Assembly.

{¶ 33} In *DeMoise v. Dowell,* the Ohio Supreme Court recognized that in Ohio, there has been "a broad-based policy determination that individual household sewage disposal systems are inherently more dangerous to the public health than sanitary sewerage systems and must be replaced when possible." [20] The court concluded that "[i]t is not necessary that the board make a case-by-case evaluation of the efficiency of each septic system. The determination has already been made that septic systems pose a potential hazard to the public health, and that they are a potential nuisance to be prevented when possible." [21] The policy preference towards use of centralized sewer systems was also recognized by the Ohio Supreme Court in *Columbus & Franklin Cty. Metro. Park Dist. v. Shank,* where the court noted that it was the intent of Congress in the Clean Water Act to promote centralization so "that rivers and streams are not to be conduits for wastewater." [22] Because a broad-based policy determination already exists that discharging systems should be eliminated and because the board's regulation was in line with that policy and its authority under R.C. 3709.21, we cannot say that the board exceeded its statutory authority in enacting Section 529.03(K). As a result, we find the Sullivans' second issue not to be well taken.

3. **The application of Section 529.03(K) does not constitute a regulatory taking of the Sullivans' property.**

{¶ 34} The Sullivans next contend that the trial court's decision was unlawful because the enforcement of Section 529.03(K) constituted an unlawful taking of their property in contravention of the Fifth and Fourteenth Amend-

---

19. *D.A.B.E., Inc,* supra, at ¶ 46.

20. *DeMoise,* supra, 10 Ohio St.3d at 95–96, 10 OBR 421, 461 N.E.2d 1286.

21. Id.

22. (1992), 65 Ohio St.3d 86, 106, 600 N.E.2d 1042.

ments to the United States Constitution and Section 19, Article I of the Ohio Constitution. The Sullivans claim that the board's enforcement of Section 529.03(K) and its subsequent refusal to grant their request for a variance from that section has reduced the fair market value of their property from $1,250,000 to only $600,000. Thus, they argue, the board has effectively taken one-half of their property and devoted it to a public use—namely, the elimination of discharging household-sewage systems.

{¶ 35} The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation."[23] Section 19, Article I of the Ohio Constitution provides that "where private property shall be taken for the public use, a compensation therefor shall be made * * *." Both the United States Supreme Court and the Ohio Supreme Court have held that a government regulation that affects the use of land constitutes a taking only if it fails to "substantially advance legitimate state interests * * * or [it] denies an owner economically viable use of his land."[24] The test is stated in the disjunctive.[25] Thus, the satisfaction of either prong establishes a taking.[26]

{¶ 36} Because the Sullivans have not claimed that Section 529.03(K) fails to substantially advance legitimate state interests, we confine our discussion to whether the regulation has denied them the economically viable use of their property.[27] Property owners are denied the economically viable use of their property when "the permitted uses are not economically feasible, or the regulation permits uses which are highly improbable or practically impossible under the circumstances."[28] Thus, "something more than loss of market value or loss of

---

**23.** This clause is applicable to the states through the Fourteenth Amendment.

**24.** See *State ex rel. Shemo v. Mayfield Hts.* (2002), 95 Ohio St.3d 59, 63, 765 N.E.2d 345.

**25.** Id. See, also, *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 ("[W]hen the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.").

**26.** Id. at 64, 765 N.E.2d 345.

**27.** See *BSW Dev. Group v. Dayton* (1998), 83 Ohio St.3d 338, 343, 699 N.E.2d 1271 ("given BSW's failure to properly raise any constitutional issue of whether the Dayton historic preservation ordinances substantially advance legitimate state interests * * * BSW could only establish entitlement to appropriation proceedings if it established that appellees' denial of the demolition permit denied BSW all economically viable use of the Wilcon Building property").

**28.** *Valley Auto Lease of Chagrin Falls v. Auburn Twp. Bd. of Zoning Appeals* (1988), 38 Ohio St.3d 184, 186, 527 N.E.2d 825; *Ketchel v. Bainbridge Twp.* (1990), 52 Ohio St.3d 239, 243–244, 557 N.E.2d 779.

comfortable enjoyment of the property is needed to constitute a taking."[29]

{¶ 37} Having reviewed the record, we hold that the board's denial of the Sullivans' proposed development has not denied them the economically viable use of their property. The Sullivans can still pursue the development of their property by subdividing it into fewer parcels and utilizing soil-absorption systems or by connecting to the sanitary-sewer system. While these options might not yield the greatest profit, this alone is insufficient to establish a denial of all beneficial uses of their property.[30] Because the board's application of Section 529.03(K) has not denied the Sullivans all economically viable use of their property, we cannot say that the trial court erred in holding that the board's enforcement of Section 529.03(K) did not effect a regulatory taking of the Sullivans' property under the United States and Ohio Constitutions.

**4. Section 529.03(K) does not violate the Equal Protection Clauses of the United States and Ohio Constitutions.**

{¶ 38} The Sullivans' last argument is that Section 529.03(K) is unlawful and unenforceable because it discriminates irrationally against property owners whose land is developed after March 8, 1999. The Sullivans contend that because Section 529.03(K) bars only owners of newly created parcels from using discharging systems and does not prohibit current or future owners of existing parcels from using discharging systems, it violates the Equal Protection Clauses of the United States and Ohio Constitutions.

{¶ 39} The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Section 2, Article I of the Ohio Constitution provides that "[a]ll political power is inherent in the people. Government is instituted for their equal protection and benefit * * *." The United States Supreme Court has set forth a three-tiered standard for equal-protection claims. Under this standard, the Supreme Court applies varying levels of scrutiny based upon the type of statutory classification being challenged and the nature of the individual

---

**29.** See *Concrete Pipe & Products, Inc. v. Constr. Laborers Pension Trust* (1993), 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 ("mere diminution in the value of property, however serious, is insufficient to demonstrate a taking"). See, also, *BSW, supra,* 83 Ohio St.3d at 344, 699 N.E.2d 1271.

**30.** See, e.g., *Euclid v. Ambler Realty Co.* (1926), 272 U.S. 365, 384, 47 S.Ct. 114, 71 L.Ed. 303 (approximately 75 percent diminution in value is not a taking); *Hadacheck v. Sebastian* (1915), 239 U.S. 394, 405, 36 S.Ct. 143, 60 L.Ed. 348 (diminution in value from $800,000 to $60,000 not a taking); *William C. Haas v. San Francisco* (C.A.9, 1979), 605 F.2d 1117, 1120 (diminution in value from $2 million to $100,000 not a taking); *State ex rel. Curtis v. Ashtabula Cty. Commrs.* (1996), 11th Dist. No. 95–A–0001, 1996 WL 297024 (holding that sewage restriction on owner of mobile-home park that limited him to the operation of only 18 lots even though he was licensed to operate 49 lots did not constitute a taking).

interests at stake.[31]  The Ohio Supreme Court has held that Ohio's Equal Protection Clause is "functionally equivalent" to the Equal Protection Clause in the United States Constitution.[32]  Consequently, Ohio's equal-protection standard is no different from that employed under federal constitutional law.[33]

{¶ 40} Because we agree with the parties that no fundamental right or suspect class is involved in this case, we must review Section 529.03(K) under a "rational basis" test.  Under this test, any law that is rationally related to a legitimate governmental objective will withstand an equal-protection challenge.[34]  Stated another way, the rational-basis test acknowledges the right of the state, in circumstances not involving a fundamental right or a suspect classification, to utilize its plenary power to make some laws applicable to some of its citizens but not to others.[35]  But the classification must be related to the objective of the statute, and it must be reasonable, not arbitrary, and rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly situated are treated alike.[36]

{¶ 41} Section 529.03(K) provides, "No new parcel shall be allowed to be created when site conditions will require use of a household sewage disposal system that necessitates discharge of effluent to the surface of the ground."  Section 529.03(K) was adopted by the board in response to public-health issues that discharging systems had created in the health district from the mid–1980s through the early 1990s.  Over that time, a series of public events, including the contamination of a local creek with sewage runoff, an outbreak of hepatitis A, and the hospitalization of a young child due to a rare protozoan infection he had contracted when playing in the contaminated creek, led to widespread public concern.  Public concern peaked when the Ohio Department of Health and the Ohio Environmental Protection Agency sanctioned the local health board for authorizing the use of discharging systems in a proposed subdivision where the effluent would have drained into a downstream homeowner's recreation lake.  It was discovered that the health district, in responding to rapid residential development, had not been following the guidelines set forth in the sanitary code, and,

---

31.  See, e.g., *Clark v. Jeter* (1988), 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465.

32.  *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, ¶ 11.

33.  See, also, *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.* (1999), 87 Ohio St.3d 55, 59, 717 N.E.2d 286.

34.  *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 29, 550 N.E.2d 181.

35.  *Roseman v. Firemen & Policemen's Death Benefit Fund* (1993), 66 Ohio St.3d 443, 446, 613 N.E.2d 574.

36.  *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 711, 576 N.E.2d 765.

thus, that it had been inappropriately granting permits for discharging systems. As a result of these problems, the incumbent board members and health commissioner were replaced and Regulation 529, the Household Sewage Disposal Code, was enacted to address the public-health crisis. The legislative objectives of Regulation 529 were to reduce and prevent health nuisances and diseases created by discharging systems and to preserve water quality while maintaining public and political support. By November 1993, the Hamilton County Health Department, pursuant to Regulation 529, had conducted inspections of 2,104 home-aeration systems and discovered that 963, or 45.8 percent, of these systems were failing. The department estimated that up to 25,000 systems existed countywide, resulting in about 11,450 systems failing countywide, which was equivalent to about 2 million gallons per day of raw sewage being discharged.

{¶ 42} The manner in which the board chose to address the problems associated with discharging systems created a distinction between current or future owners of existing parcels and owners of newly created parcels. Under Regulation 529, current or future owners of existing parcels were permitted to retain their discharging systems. They were required to repair and/or replace the discharging systems only if they failed or if sanitary-sewer systems became available. Owners of newly created parcels, on the other hand, were not permitted to have discharging systems after March 8, 1998. The foreseeable effect of this distinction was an improvement in water quality without economically crippling current homeowners with the sudden and unexpected expense of immediately replacing their discharging systems. By creating a distinction between current or future owners of existing parcels and owners of newly created parcels, the board was able to protect those homeowners who had believed that they had complied with all applicable standards when their homes were built.[37] Furthermore, the board, to ensure environmental compliance from current or future owners of existing parcels, set up comprehensive inspection and permitting requirements for these systems. In essence, the regulation insulated current or future owners of existing parcels from the financial burden of immediate compliance with more stringent environmental standards. At the same time, the board was able to regulate in a more categorical and sweeping manner the development of newly created parcels. Federal courts have upheld similar regulations that have taken a gradual approach to solving a problem and have protected the interests of those who have relied upon prior law.[38]

---

37. Federal courts have held that protecting the interests of those who have relied on prior laws "is a matter of simple fairness" and a legitimate governmental purpose. See *Sklar v. Byrne* (C.A.7, 1984), 727 F.2d 633, 642.

38. See, e.g., *New Orleans v. Dukes* (1976), 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511; *Katzenbach v. Morgan* (1966), 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828; *Williamson v. Lee Optical* (1955), 348 U.S. 483, 488–489, 75 S.Ct. 461, 99 L.Ed. 563.

{¶ 43} Because there are reasonable grounds for distinguishing between current or future owners of existing parcels and owners of newly created parcels, and because that distinction advances legitimate legislative objectives, we cannot say that Section 529.03(K) denies the equal protection of the laws.[39]

### III.  Conclusion

{¶ 44} Having reviewed the record and the applicable case law, we conclude the following:  (1) the decision of the common pleas court is supported by a preponderance of reliable, probative, and substantial evidence;  (2) Section 529.03(K) was within the board's authority to enact;  (3) the application of Section 529.03(K) to the Sullivans' property did not constitute a taking;  and (4) Section 529.03(K) does not violate the Equal Protection Clauses of the United States and Ohio Constitutions.  We, therefore, overrule the Sullivans' sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

WINKLER and WALSH, JJ., concur.

JAMES E. WALSH, J., of the Twelfth Appellate District, sitting by assignment.

---

**39.**  See *Schwan v. Riverside Methodist Hosp.* (1983), 6 Ohio St.3d 300, 301, 6 OBR 361, 452 N.E.2d 1337 ("[T]he statute must be upheld if there exists any conceivable set of facts under which the classification rationally further[s] a legitimate legislative objective.").