The STATE ex rel. GILBERT et al., Relators,

v.

The CITY OF CINCINNATI et al., Respondents.

[Cite as *State ex rel. Gilbert v. Cincinnati,* 174 Ohio App.3d 89, 2007-Ohio-6332.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–070166.

Decided Nov. 30, 2007.

Manley Burke, Matthew W. Fellerhoff, and Daniel J. McCarthy, for relators.

J. Rita McNeil, Cincinnati City Solicitor, Terrance A. Nestor, Senior Assistant City Solicitor, and Paula Y. Boggs, Assistant City Solicitor, for respondents.

DINKELACKER, Judge.

{¶ 1} In this original action, relators Richard and Lee Gilbert ask this court for a writ of mandamus compelling respondents, the city of Cincinnati, the Hamilton County Board of Commissioners, and the Metropolitan Sewer District of Greater Cincinnati ("MSD"), to commence an appropriation proceeding because the failure to remedy conditions affecting their property has resulted in a taking for which they are entitled to compensation. The Gilberts are not entitled to a writ.

## Investment Property Remains Underdeveloped

{¶ 2} The Gilberts purchased a piece of property in Anderson Township in 1998. The property consisted of 5.67 acres and had one house that the Gilberts used as their residence. They had purchased the property with the hope of dividing it into lots for development. Both Gilberts have experience in real-estate sales and wanted to develop the property "as permitted by the applicable zoning provisions." As the property is currently zoned, the Gilberts claim, 11 single-family parcels could be created.

{¶ 3} The problem that the Gilberts had with implementing their plan was a lack of access to a sewer system. While there is sewer service in the area, the

property has no connection to it. In fact, the home that the Gilberts use as their primary residence utilizes a septic system.

{¶ 4} To pursue their goal, the Gilberts repeatedly sought to tap into the sewer system. Each time, they were told by the MSD that the Brittany Acres Pump Station—the pump station that would service the property—was at capacity and that additional "taps" would become available once the station was upgraded. The Gilberts were repeatedly told that such improvements were forthcoming, but the work never began. The inability to begin the project appears to have been related to a lack of funding.

{¶ 5} In addition to their inability to tap into the sewer line, the Gilberts were also told that they could not place additional septic systems on the property. The Hamilton County Combined Health District denied their request for additional systems because the property would have access to sewer service once the Brittany Acres upgrade was completed.

{¶ 6} During a meeting with a health district representative in 2003, they were told that they could have four taps into the sewer system. The Gilberts declined this offer, believing that it was not legitimate. This belief was based on the fact that they had been told that the station was at capacity and that no upgrades had occurred. Testimony from an MSD engineer, however, indicated that it was a legitimate offer. The offer was confirmed in a letter dated December 18, 2003, and again confirmed in a letter dated March 2, 2004.

### Signage Near Creek Designates Sanitary Sewer Overflow

{¶ 7} In addition to the problems that the Gilberts have had with trying to develop their property, they claim that raw sewage has been escaping from the Brittany Acres station and entering their property in a creek that flows through their land. A sign on the public right-of-way overlooking the creek states the following:

{¶ 8} "WARNING

{¶ 9} "SANITARY SEWER OVERFLOW

{¶ 10} "Water in this area may contain sanitary sewage.

{¶ 11} "Contact with sewage poses potential health risk.

{¶ 12} "For more information, call:

{¶ 13} "METROPOLITAN SEWER DISTRICT

{¶ 14} "(513) 352–4900

{¶ 15} "SSO NO. 852."

{¶ 16} In depositions, both Gilberts testified that they have seen raw sewage in the area of the creek on several occasions and that they often keep their windows

closed because of the odor. However, the creek has never been tested for the presence of raw sewage. Further, the Gilberts have never contacted the MSD directly to find out if the pump station has ever overflowed into the creek, and they have never asked why the sign has been placed there.

{¶ 17} Thomas Schweirs, an engineer with the MSD, was the only sewer expert to testify in this case. He stated that the sign was placed by the MSD as part of a federal consent decree that involved numerous governmental and environmental groups and addressed the sewage system throughout Greater Cincinnati. He did not know what the criteria were for placing such a sign, but did testify that—as he *understood* the guidelines—a pump station need not actually overflow for a sign to be placed. He said that signs were placed "any place [that] has *the potential* for an overflow into a creek." He also testified that he had no personal knowledge that the Brittany Acres station had ever overflowed—although he "heard that it had."

### Requirements for Mandamus Relief

{¶ 18} To show that they are entitled to a writ of mandamus from this court compelling another governmental agency to appropriate their property, the Gilberts must demonstrate the following: (1) they possess a clear legal right to appropriation, (2) the respondents have a clear legal duty to appropriate the property, and (3) they have no plain and adequate remedy at law.[1] This court, as the trier of fact and the arbiter of law, must determine whether the Gilberts' private property has been taken by the public authorities.[2] To conclude that it has, "the proof produced must be plain, clear, and convincing before a court is justified in using the strong arm of the law by way of granting the writ." [3]

{¶ 19} Moreover, mandamus is an extraordinary remedy that is to be granted with caution and only when the right is clear. It should not issue in doubtful cases.[4] The issuance of a writ of mandamus is within the discretion of

1. *Cincinnati Entertainment Assoc., Ltd. v. Hamilton Cty. Bd. of Commrs.* (2001), 141 Ohio App.3d 803, 753 N.E.2d 884, citing *State ex rel. Carter v. Wilkinson* (1994), 70 Ohio St.3d 65, 637 N.E.2d 1, and *State ex rel. Westchester Estates, Inc. v. Bacon* (1980), 61 Ohio St.2d 42, 15 O.O.3d 53, 399 N.E.2d 81, paragraph one of the syllabus.

2. *Conner v. Caledonia,* 3rd Dist. No. 9–04–48, 2005-Ohio-1427, 2005 WL 696874, ¶ 14, citing *State ex rel. BSW Dev. Group v. Dayton* (1998), 83 Ohio St.3d 338, 342, 699 N.E.2d 1271.

3. Id., quoting *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 161, 40 O.O.2d 141, 228 N.E.2d 631.

4. *State ex rel. Taylor v. Glasser* (1977), 50 Ohio St.2d 165, 4 O.O.3d 367, 364 N.E.2d 1; *State ex rel. Shafer v. Ohio Turnpike Comm.* (1953), 159 Ohio St. 581, 50 O.O. 465, 113 N.E.2d 14; and *State ex rel. Connole v. Cleveland Bd. of Ed.* (1993), 87 Ohio App.3d 43, 621 N.E.2d 850.

the court, depending upon the facts and circumstances of the case, including the relators' rights, the relators' conduct, the equity and justice of the relators' case, and public policy.[5]

{¶ 20} In their mandamus petition, the Gilberts claim that two separate actions have resulted in a taking such that respondents should be required to commence appropriation proceedings. First, they claim that the failure to improve the pump station has frustrated "reasonable investment-backed expectations" and has resulted in a taking. Additionally, they claim that the "failure to upgrade" has caused raw sewage to pour into the creek and that the "direct encroachment of the raw sewage onto the Gilberts' property is a taking." While there are allegations regarding the "stigma" resulting from the presence of the sign, they have not been clearly articulated in terms of a taking. For purposes of this discussion, however, we treat the allegations concerning the sign as claiming a taking.

## Prevention of Full Development is Not a Taking

{¶ 21} The Gilberts argue that preventing them from fully developing their property and from meeting "investment-backed expectations" has resulted in a taking. We disagree. The ability to begin new construction is not "one of the most essential sticks in the bundle of rights that are commonly characterized as property." [6] Therefore, the frustration of the Gilberts' ability to fully develop their property is not a taking.[7]

{¶ 22} In support of their argument, the Gilberts have relied heavily on an older decision from the Eighth Appellate District.[8] In that case, the landowners had purchased commercial property and demolished the buildings on it. When they sought permits to build a restaurant, they were told that there was a building moratorium because of strains on the sewer system. There was no plan in place to fix the problem with the sewers. The court found a taking.

{¶ 23} Factually, the case is significantly different from the case at bar. In *November Properties*, the owners were left with a vacant lot in a commercial district. In this case, the Gilberts, at the very least, have been able to continue

---

5. *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631; *State ex rel. Bennett v. Lime* (1978), 55 Ohio St.2d 62, 9 O.O.3d 69, 378 N.E.2d 152; and *State ex rel. Mettler v. Stratton* (1941), 139 Ohio St. 86, 22 O.O. 56, 38 N.E.2d 393.

6. *State ex rel. BSW Dev.*, 83 Ohio St.3d at 343, 699 N.E.2d 1271, citing *Dolan v. Tigard* (1994), 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304.

7. Id.

8. *November Properties, Inc. v. Mayfield Hts.* (Dec. 6, 1979), 8th Dist. No. 39626, 1979 WL 210535.

to use the property as their residence. And if the testimony of Thomas Schweirs is to be believed, they may be able to divide the property into four parcels with the taps offered by the MSD.

{¶ 24} In a similar case, a property owner claimed that limited sewer access prevented optimal development of investment property and constituted a regulatory taking.[9] This court held that it did not.[10] We concluded that the property owners could "still pursue the development of their property by subdividing it into fewer parcels and utilizing soil-absorption systems or by connecting to the sanitary-sewer system. While these options might not yield the greatest profit, this alone is insufficient to establish a denial of all beneficial uses of their property."[11]

{¶ 25} On this point, respondents properly stress that, to obtain relief, a property owner must be denied all economically viable use of the land. The Gilberts try to avoid this distinction by claiming that *November Properties* contained "no discussion or holding that the property owner [in that case] was denied all use of their property." But it is hard to imagine how forcing a property owner to keep a commercial lot vacant does not deny "all use." Furthermore, the *November Properties* decision actually says that "the present value of the subject property is zero inasmuch as it was purchased as commercial property but cannot be used as such."[12]

{¶ 26} The Gilberts compare their inability to develop the property to the "moratorium" on development that was at issue in *November Properties*. But the court in *November Properties* stressed that it was not just that there was a moratorium in place, but also that there was no plan to fix the problem. The court held that "there must be, coupled with this moratorium, a reasonable plan for installation of adequate sewers within a reasonable time."[13] In this case,

---

9. *Sullivan v. Hamilton Cty. Bd. of Health,* 155 Ohio App.3d 609, 2003-Ohio-6916, 802 N.E.2d 698.

10. Id. at ¶ 37.

11. Id., citing *Euclid v. Ambler Realty Co.* (1926), 272 U.S. 365, 384, 47 S.Ct. 114, 71 L.Ed. 303 (approximately 75 percent diminution in value is not a taking); *Hadacheck v. Sebastian* (1915), 239 U.S. 394, 405, 36 S.Ct. 143, 60 L.Ed. 348 (diminution in value from $800,000 to $60,000 not a taking); *William C. Haas v. San Francisco* (C.A.9, 1979), 605 F.2d 1117, 1120 (diminution in value from $2 million to $100,000 not a taking); *State ex rel. Curtis v. Ashtabula Cty. Commrs.* (May 3, 1996), 11th Dist. No. 95–A–0001, 1996 WL 297024 (holding that sewage restriction on owner of mobile-home park that limited him to the operation of only 18 lots even though he was licensed to operate 49 lots did not constitute a taking).

12. *November Properties* at *3.

13. Id. at *17.

there has been a plan in place, but no funding until recently. In fact, the record now reflects that work on the improvement project has begun and will be completed by mid–2008.

{¶ 27} For these reasons, we cannot conclude that the Gilberts' inability to develop their property to the maximum allowed under its zoning classification has resulted in a taking for which respondents are required to commence an appropriation action.

### The Gilberts Have Not Established a Taking Relating Either to Sewage or the Sign

{¶ 28} The second aspect of the Gilberts' claims relates to the alleged physical taking by dumping raw sewage onto the property. While this court has previously held that permitting large quantities of raw sewage to flow from a sewer system onto private property constitutes a taking,[14] the Gilberts have failed to present sufficient evidence that sewage from the Brittany Acres facility has overflowed onto their property.

{¶ 29} In their brief, the Gilberts argue that "there is no dispute that the Respondents are causing raw sewage to be deposited onto the Gilberts' property." This assertion is based upon (1) the placement of the Sanitary Sewer Overflow sign and (2) documents attached to the deposition of Thomas Schweirs that state that the station "frequently bypasses." Neither rises to the level of "plain, clear, and convincing" evidence.

{¶ 30} First, the only evidence in the record regarding the placement of the Sanitary Sewer Overflow sign is that it was placed pursuant to conditions in a federal consent decree that itself is not part of this record. The only testimony regarding what those conditions might have been came from Schweirs, who had no personal knowledge of the contents of the decree. The only testimony he could provide was that a sign was placed "[a]ny place [that] has the potential for an overflow into a creek."

{¶ 31} The Gilberts have failed to present any testimony from anyone with personal knowledge of the workings of the consent decree and have failed to place the consent decree itself into evidence. Under these circumstances, we cannot conclude that the mere placement of the sign was an admission that the station overflows.

{¶ 32} The Gilberts also refer to a document entitled "MSD Fact Sheet" that was attached to Schweir's deposition as an exhibit. That document states that

---

14. See *Bd. of Commrs. of Hamilton Cty. v. Florian* (Jan. 16, 1985), 1st Dist. Nos. C–830880 and C–830881, 1985 WL 9266.

"[t]he existing pump station cannot keep up with wet weather flow conditions and frequently bypasses."

{¶ 33} When asked, Schweir could not attest to the accuracy of the document because he did not create it. This document was not one of the documents that respondents admitted to being accurate in response to the Gilberts' requests for admissions. In fact, respondents specifically denied for want of knowledge the statement "[r]aw sewage has overflowed from the Brittany Acres into a creek that runs adjacent to and flows through the property."

{¶ 34} In sum, the Gilberts have presented no evidence that any raw sewage has actually come from the Brittany Acres station. The only evidence that they presented on this point was a single sentence in a document whose accuracy could not be confirmed. The only testimony regarding any aspect of the Brittany Acres Pump Station came from Schweirs, who repeatedly testified that he had no personal knowledge regarding the condition of the Brittany Acres station, that he had no personal knowledge that the station overflowed, and that, until the time of his deposition, he had not seen any reports that it overflowed. This proof simply does not rise to the level of "plain, clear, and convincing."

{¶ 35} As an aspect of this argument, the Gilberts argue that the sign itself is a "stigmatization" of the property that has effected a taking. We have been unable to find a single case that stands for the proposition that a taking occurs when a governmental entity is required by law to place a sign in a public right-of-way.

{¶ 36} In this case, the MSD placed the sign in the right-of-way next to the Gilberts' creek, and the Gilberts do not dispute that MSD was required to place the sign by the federal consent decree.

{¶ 37} The Gilberts have also failed to clearly explain how the sign has effected a taking. While they have personally testified that the property is stigmatized, they have not talked to anyone else who has told them as much, they have not attempted to market the property, and they have never worked with a property that had such a sign. Without some evidence other than their self-serving testimony, and without some legal authority that creates governmental liability for placing a sign that the government is required to place, the Gilberts have failed to show that they possess a clear legal right to appropriation or that the respondents have a clear legal duty to appropriate their property.

### Conclusion

{¶ 38} For the reasons set forth above, the petition filed by the Gilberts is without merit, and a writ of mandamus is hereby denied. Having determined

that the Gilberts are not entitled to mandamus relief, the motion for summary judgment filed by respondents is moot.

Writ denied.

HENDON, P.J., and CUNNINGHAM, J., concur.